[No. 75563-9.   En Banc.]
Argued May 12, 2005.     Decided September 15, 2005.

*In the Matter of the Parentage of* J.M.K. ET AL.

TERESA BROCK, *Petitioner*, v. MICHAEL J. KEPL, *Respondent*.

*Boyd S. Wiley, Daniel W. Smith*, and *Talis M. Abolins* (of *Campbell, Dille, Barnett, Smith & Wiley*), for petitioner.
*Christopher M. Constantine*, for respondent.

¶1 MADSEN, J. — Petitioner Teresa Brock challenges the Court of Appeals' decision reversing the trial court's summary judgment determining the paternity of her two boys. Michael Kepl, the biological father, signed a paternity affidavit for the older child but not for the younger child. The trial court determined that the biological father was the legal (natural) father for both boys. The Court of Appeals reversed, agreeing with the biological father that, as a matter of law, the former artificial insemination statute shielded him from legal fatherhood status with regard to both boys. At issue is whether, under former parentage statutes,[1] a biological father is the legal father of

---

[1] Chapter 26.26 RCW, the Uniform Parentage Act, was modified in 2002. *See* LAWS OF 2002, ch. 302, § 711; Second Substitute H.B. 2346, 57th Leg., Reg. Sess. (Wash. 2002) (explaining that the former RCW parentage provisions were based on the Uniform Parentage Act (UPA) of 1973, drafted by the National Conference of Commissioners on Uniform State Laws (the Commissioners), and were repealed and replaced by the UPA of 2000). Current RCW 26.26.904 provides that "[a] proceeding to adjudicate parentage which was commenced before June 13, 2002, is governed by the law in effect at the time the proceeding was commenced." Since Brock commenced this parentage proceeding on February 20, 2002, the applicable parentage provisions are those in effect on February 20, 2002. In this opinion, the applicable statutes (when they have been modified by the legislature after this case was brought) are referred to as the "former" parentage provisions.

two boys conceived by means of assisted reproductive technology by a woman to whom the man was not married. We hold that Kepl is the legal father of both boys and affirm the trial court's summary judgment determination of paternity.

## FACTS

¶2 Michael Kepl, the respondent, had a long-term romantic relationship with Teresa Brock, the petitioner, while he was married to another woman. Brock was not married during her relationship with Kepl. The parties met in the late 1980s at work and shortly thereafter began a sexual relationship that continued for approximately one year, ending in 1990 or 1991. Kepl's wife gave birth to his daughter, AK, in 1991. The parties renewed their sexual relationship in the early- to mid-1990s (1992-1994) which lasted nearly 10 years. The parties dispute whether their sexual relationship ended by January or March 2001.

¶3 In 1995, the parties began to try actively to conceive a child. The parties first had unprotected sexual intercourse. Brock then sought help from doctors and fertility clinics in Tacoma and Seattle. Brock used fertility drugs and the parties timed intercourse. These processes were unsuccessful. Brock then asked Kepl to donate sperm which he did multiple times. Brock then underwent multiple artificial insemination procedures using Kepl's sperm when the parties were not able to time intercourse. Although the parties at times inaccurately refer to the fertility process as "artificial insemination," the record indicates that Brock eventually conceived her children using in vitro fertilization, a type of assisted reproduction involving the implantation of preembryos in Brock created with Kepl's sperm. Clerk's Papers (CP) at 30, 67, 147, 196; Report of Proceed-

After Washington state adopted the UPA of 2000, the Commissioners revised that version of the UPA in 2002 in part because it treated children of an unmarried couple differently than those of a married couple. *See, e.g.,* John J. Sampson, "Preface to the Amendments to the Uniform Parentage Act (2002)," 37 Fam. L.Q. 1 (2003-2004).

ings (RP) at 20-21 (May 21, 2002); RP at 13 (Aug. 27, 2001).[2] Currently, seven frozen preembryos owned by Kepl and Brock remain at a fertility clinic in Seattle.

¶4 Brock gave birth to her first son, JMK, on December 30, 1998. Apparently, Brock was induced a week earlier at Kepl's request so that he could attend the birth given his other commitments. When the first inducement was not successful, Brock was induced again and gave birth approximately one week later. Kepl was present at the hospital the day she gave birth and Kepl was the first person other than hospital staff to hold JMK.

¶5 Photographs in the record show Kepl at the hospital holding JMK and with Brock. Kepl gave Brock flowers and cards, including messages of "It's a Boy—Finally!" and "Bunches of love to you [Brock] and our bundle of joy" with Kepl signing with both his first name and as "Dad." CP at 155-59. At the hospital, Kepl completed and signed a paternity affidavit with Brock, and Kepl's name was placed on JMK's birth certificate. A number of Brock's friends were present in the hospital room when Kepl and Brock completed and signed the paternity affidavit. The paternity affidavit provided at the top of the document:

> This Document Establishes Paternity Pursuant to RCW 26-.26.040
>
> NOTE: Notarized signatures of the parents below establish legal paternity and the responsibility to support this child. This document becomes binding sixty (60) days after it is filed with the Department of Health. After 60 days, paternity can not be changed without a court order.

---

[2] Artificial insemination is defined as "the introduction of semen into the vagina other than by coitus." STEDMAN'S MEDICAL DICTIONARY 906 (27th ed. 2000). *See also* ON-LINE MEDICAL DICTIONARY, Dep't of Medical Oncology, Univ. of Newcastle (1997-2004), *available at* http://cancerweb.ncl.ac.uk/omd/ (artificial insemination is "the placement of a sperm sample inside the female reproductive tract to improve the female's chances of getting pregnant").

In vitro fertilization is " 'a process whereby (usually multiple) ova are placed in a medium to which sperm are added for fertilization, the zygote thus produced then being introduced into the uterus and allowed to develop to term.' " *In re Marriage of Litowitz*, 146 Wn.2d 514, 517 n.8, 48 P.3d 261 (2002) (quoting STEDMAN'S MEDICAL DICTIONARY 637 (26th ed. 1995)); STEDMAN'S MEDICAL DICTIONARY 657 (27th ed. 2000).

CP at 12. Both their signatures were notarized. Under former RCW 26.26.040(1)(e) (1997), after the 60-day period has passed, the acknowledgement of paternity may be challenged in court only on the basis of fraud, duress, or material mistake of fact, with the burden upon the challenger. Kepl did not challenge paternity of JMK within 60 days after the filing of the acknowledgment.

¶6 Kepl visited JMK weekly. Kepl took Brock and JMK on vacation and participated in holiday events with Brock and JMK. The record contains numerous photographs of Kepl holding and playing with JMK, including Kepl and JMK at Woodland Park Zoo in 2000, at Mount Rainer Park in 2001, and at his home and at Brock's home. Photographs also show Kepl attending JMK's first and second birthday parties. The record also contains professional photographs of Kepl, Brock, and JMK posed as a traditional family taken in April 1999.

¶7 In April 1999, when JMK was four months old, Kepl applied for a $100,000 life insurance policy identifying JMK as his son and primary beneficiary and identifying Brock as his significant other and contingent beneficiary. Kepl had a separate life insurance policy in effect for his daughter, AK, for $500,000. Kepl's insurance policy application was approved in May 1999 for $100,000 coverage requiring annual payments of $749 for 20 years.

¶8 In February 2001, Brock conceived a second child, again using in vitro fertilization. Brock claims that having a second child, a sibling for JMK, was Kepl's idea and that Kepl paid Brock $700 to help pay for the medical procedure. Kepl claims that he had no input into the decision to conceive a second child. Brock gave birth to a second son, DRK, on October 27, 2001. Kepl visited the hospital while Brock was in labor and the day after DRK was born. However, Kepl did not sign a paternity affidavit for DRK.

¶9 Prior to the first child's birth, Kepl and Brock set up a joint savings account for JMK. Kepl paid approximately $400-600 a month, which was briefly increased to $1,000 after the second child was born. The record contains bank

records indicating that Kepl made child support payments until January 2002, when JMK was three years old and DRK was three months old. According to both parties, Kepl stopped making the payments after Kepl's wife found out about his extramarital affair in January 2002.

¶10 Kepl claims he paid child support payments in order to continue his sexual relationship with Brock and due to blackmail, to keep Brock from telling his wife about their relationship. Kepl also claims that he was under a lot of stress during the time Brock gave birth to her first child and signed the paternity affidavit under blackmail, duress, and/or fraud. Additionally, Kepl claimed he donated sperm only as a friend and did not intend to be a parent. In contrast, Brock claims that Kepl voluntarily made child support payments and purchased the life insurance policy for JMK, consistent with his involvement and visitation with her first son, and voluntarily signed the paternity affidavit.

## PROCEDURAL HISTORY

¶11 On February 20, 2002, Brock filed a petition to establish JMK's and DRK's parentage in the Superior Court of Pierce County. In the petition, Brock requested the court enter an order and judgment that (1) Kepl be declared the natural father of JMK and DRK, (2) the birth certificate of DRK be amended to identify Kepl as the father, (3) child support be determined pursuant to the Washington State Support Schedule, (4) Kepl pay past support (being credited for earlier payments), (5) a parenting plan be adopted, and (6) court costs, blood tests, guardian ad litem and attorney fees be awarded by the court. Brock also moved the court for an order appointing a guardian ad litem for the two boys, which the court granted that same day, appointing John Brooks as guardian ad litem for JMK and DRK.

¶12 Kepl responded to Brock's parentage petition by requesting paternity blood testing, claiming he was not necessarily the biological father of the two boys. Kepl urged

the court not to enter child support or a parenting plan until paternity was established using blood tests.

¶13 Kepl's counsel sent letters and subpoena duces tecum to two fertility clinics and three doctors, requesting all medical records and documentation from 1990 to 2002 relating to Kepl and Brock. Brock moved for a protective order protecting her medical records. On April 12, 2002, Judge Thomas P. Larkin granted the protective order and urged Kepl and the boys to complete the blood testing promptly as suggested by the guardian ad litem.[3]

¶14 On May 3, 2002, Brock filed a motion to require Kepl to submit to paternity blood testing. Kepl opposed the motion, arguing that under former RCW 26.26.050(2) (1976), he cannot be the natural father of either child because he did not sign a written agreement in advance of impregnation as provided under the artificial insemination statute.[4] Additionally, Kepl argued that the court lacked authority to require blood testing because under former RCW 26.26.100(1) (1997) a court may order blood testing only when there is a reasonable possibility that the "requisite sexual contact" occurred. Kepl asserted that because these children were conceived using artificial reproduction,

---

[3] The guardian ad litem affirmatively recommended genetic parentage testing for DRK and, given that Kepl had signed a paternity affidavit for JMK, recommended genetic testing for JMK if requested by Kepl. The guardian ad litem concluded "In the case of both children, any genetic testing should be done as soon as possible." CP at 31.

[4] Former RCW 26.26.050(2) provides:

"The donor of semen provided to a licensed physician for use in artificial insemination of a woman other than the donor's wife is treated in law as if he were not the natural father of a child thereby conceived unless the donor and the woman agree in writing that said donor shall be the father. The agreement must be in writing and signed by the donor and the woman. The physician shall certify their signatures and the date of the insemination and file the agreement with the registrar of vital statistics, where it shall be kept confidential and in a sealed file."

Former RCW 26.26.050(3) provides:

"The failure of the licensed physician to perform any administrative act required by this section shall not affect the father and child relationship. All papers and records pertaining to the insemination, whether part of the permanent record of a court or of a file held by the supervising physician or elsewhere, are subject to inspection only in exceptional cases upon an order of the court for good cause shown."

the "requisite sexual contact" could not have occurred. Thus, even though Kepl and Brock were in a sexual relationship, the children were not conceived from natural sexual contact.

¶15 On May 21, 2001, Commissioner David H. Johnson ordered that Kepl and the two boys submit to blood testing. Judge Larkin denied Kepl's order seeking revision of the order requiring blood tests. The blood tests indicate that Kepl is the biological father of JMK with a combined probability index of 99.997 percent and of DRK with a combined probability index of 99.97 percent.

¶16 On June 21, 2002, Brock filed a motion for summary judgment on parentage of JMK under former RCW 26.26.040 and former RCW 70.58.080 (1997) due to the signed paternity affidavit.[5] Brock argued that Kepl is

---

[5] Former RCW 26.26.040(1)(e) Presumption of Paternity, provides:

"(1) A man is presumed to be the natural father of a child for all intents and purposes if:

" . . . .

"(e) He acknowledges his paternity of the child pursuant to RCW 70.58.080 or in a writing filed with the state registrar of vital statistics, which shall promptly inform the mother of the filing of the acknowledgment, if she does not dispute the acknowledgment within a reasonable time after being informed thereof, in a writing filed with the state registrar of vital statistics. An acknowledgment of paternity under RCW 70.58.080 shall be a legal finding of paternity of the child sixty days after the acknowledgment is filed with the center for health statistics unless the acknowledgment is sooner rescinded or challenged. After the sixty-day period has passed, the acknowledgment may be challenged in court only on the basis of fraud, duress, or material mistake of fact, with the burden of proof upon the challenger. Legal responsibilities of the challenger, including child support obligations, may not be suspended during the challenge, except for good cause shown. Judicial and administrative proceedings are neither required nor permitted to ratify an unchallenged acknowledgement of paternity filed after July 27, 1997. In order to enforce rights of residential time, custody, and visitation, a man presumed to be the father as a result of filing a written acknowledgment must seek appropriate judicial orders under this title."

Former RCW 70.58.080(4)(a) Birth Certificates—Filing—Establishing paternity—Surname of child provides:

"(4) Upon the birth of a child to an unmarried woman, the attending physician, midwife, or his or her agent shall:

"(a) Provide an opportunity for the child's mother and natural father to complete an affidavit acknowledging paternity. The completed affidavit shall be filed with the state registrar of vital statistics. The affidavit shall contain or have attached:

"presumed to be the father based on RCW 26.26.040" and there is no "clear, cogent, and convincing evidence" to rebut the presumption. CP at 228. On July 23, 2002, after the blood tests conclusively determined that Kepl was the biological father to both boys, Brock filed a second summary judgment motion to establish Kepl as the legal father to both JMK and DRK.

¶17 Commissioner Camerra Fleury granted Brock's summary judgment motion, concluding that Kepl was the legal (natural)[6] father of both JMK and DRK. A subsequent hearing was held to determine child support. There, Commissioner H. Edward Haarmann granted Brock's temporary order, directing child support be paid and ordering Kepl to pay Brock's attorney fees. Kepl sought revision of the summary judgment decision on parentage, the orders on child support and attorney fees, and of the protective order regarding Brock's medical records.

¶18 Judge Larkin denied Kepl's motion for revision. During the hearing, Judge Larkin dealt with each child separately and reasoned:

> [W]e're going to talk about each of the kids, because there's different factual situations that involve—with [JMK] the credible evidence that I've reviewed in this case is overwhelming. There's the affidavit of acknowledgement of paternity that he signed. There's a long relationship between the two parents in

---

"(i) A sworn statement by the mother consenting to the assertion of paternity and stating that this is the only possible father;

"(ii) A statement by the father that he is the natural father of the child;

"(iii) A sworn statement signed by the mother and the putative father that each has been given notice, both orally and in writing, of the alternatives to, the legal consequences of, and the rights, including, if one parent is a minor, any rights afforded due to minority status, and responsibilities that arise from, signing the affidavit acknowledging paternity;

"(iv) Written information, furnished by the department of social and health services, explaining the implications of signing, including parental rights and responsibilities; and

"(v) The social security numbers of both parents."

[6] We use the term "natural" father because former chapter 26.26 RCW used that term to describe legal paternity. The revised parentage provisions no longer use this term. *See, e.g.*, RCW 26.26.116 (using the term "father" to describe legal paternity).

this. There's a confirmation of the paternity testing, the letters and cards. To come in and say that she put a card in front of him that says, Honey, I love you and the kids and all this is absurd, beyond my belief, that over a long period of time is not credible.

So, as far as [JMK] is concerned, there's just no question about it [Kepl's paternity].

With [DRK] it may get a little more complicated than that in taking a look. And so I took a look at his situation a little bit differently because we don't have that acknowledgment of paternity in that case as everybody agrees on. So then I go and look at everything that took place with him and what had happened and then the confirmation that he's the father. And then I look at the best interest and take a broad look at that. And, again, I'm satisfied that the decision made by the commissioner in this case is the right decision.

RP at 17-18 (Oct. 25, 2002). Judge Larkin also denied Kepl's motion for revision of the September 18, 2002 order granting attorney fees and child support. However, Judge Larkin granted partial relief to a motion to lift protective order, allowing Kepl to review Brock's medical records as they pertain to her ability to work. Brock is currently disabled and receives social security disability payments and food stamps.

¶19 The Court of Appeals reversed stating, "Because former RCW 26.26.050(2) protected semen donors and because Kepl donated semen, the proper inquiry for the parentage of J.M.K. and D.R.K. begins with the artificial insemination statute. Brock and Kepl did not agree in writing that Kepl, by donating semen, would become the children's legal father. Nor is there any evidence in the record from which we could infer such a writing. Thus, Brock's arguments fail." *In re Parentage of J.M.K.*, 121 Wn. App. 578, 583, 89 P.3d 309 (2004).

## ANALYSIS

¶20 This court is reviewing the order granting summary judgment. A motion for summary judgment is properly

granted where there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. CR 56(c). The standard of review on appeal from an order on summary judgment is de novo. The appellate court engages in the same inquiry as the trial court. *Citizens for Responsible Wildlife Mgmt. v. State*, 149 Wn.2d 622, 630, 71 P.3d 644 (2003); *Herron v. Tribune Publ'g Co.*, 108 Wn.2d 162, 169, 736 P.2d 249 (1987). This court should affirm the grant of summary judgment only if, from all the evidence, it is clear that reasonable persons could reach but one conclusion. *Citizens for Responsible Wildlife Mgmt.*, 149 Wn.2d at 630-31.

¶21 As the trial court did, given the factual differences in this case, we address each child separately. Brock moved for summary judgment on the parentage of JMK under the theory that, under former RCW 26.26.040(1)(e) and former RCW 70.58.080(4), Kepl became the legal (natural) father 60 days after Kepl signed the paternity affidavit. Alternatively, Brock argued that Brock and Kepl's completion of the paternity affidavit establishes Kepl's written consent to paternity under former RCW 26.26.050(2).

¶22 Kepl argues that his signature on the paternity affidavit had no legal effect because of the statutory protections granted by former RCW 26.26.050(2) for semen donors who do not sign written consents in advance of insemination of a woman to whom the man is not married. Kepl argues that Brock invites the court to ignore former RCW 26-.26.050(2) in favor of former RCW 26.26.040(1)(e) and former RCW 70.58.080(4). Kepl asserts that Brock's approach must be rejected because "it is neither the function nor the prerogative of the Court to ignore legislative enactments," and instead, the proper approach is to " 'harmonize statutes' " pertaining to the subject matter and maintain the integrity of the statutes within the overall statutory scheme (quoting *Philippides v. Bernard*, 151 Wn.2d 376, 385, 88 P.3d 939 (2004)). Suppl. Br. of Resp't at 2-3.

¶23 The meaning of a statute is inherently a question of law and our review is de novo. *King County v.*

*Cent. Puget Sound Growth Mgmt. Hr'g's Bd.*, 142 Wn.2d 543, 555, 14 P.3d 133 (2000); *Dioxin/Organochlorine Ctr. v. Pollution Control Hr'g's Bd.*, 131 Wn.2d 345, 352, 932 P.2d 158 (1997). The primary goal of statutory interpretation is to ascertain and give effect to the legislature's intent and purpose. *Am. Cont'l Ins. Co. v. Steen*, 151 Wn.2d 512, 518, 91 P.3d 864 (2004); *Dep't of Ecology v. Campbell & Gwinn, L.L.C.*, 146 Wn.2d 1, 9, 43 P.3d 4 (2002). This is done by considering the statute as a whole, giving effect to all that the legislature has said, and by using related statutes to help identify the legislative intent embodied in the provision in question. *Campbell & Gwinn*, 146 Wn.2d at 11. If, after this inquiry, the statute can reasonably be interpreted in more than one way, then it is ambiguous and it is appropriate to resort to principles of statutory construction to assist in interpretation. *State ex rel. Citizens against Tolls (CAT) v. Murphy*, 151 Wn.2d 226, 242-43, 88 P.3d 375 (2004); *Campbell & Gwinn*, 146 Wn.2d at 12. Strained, unlikely, or absurd consequences resulting from a literal reading are to be avoided. *State v. Neher*, 112 Wn.2d 347, 351, 771 P.2d 330 (1989). If, among alternative constructions, one or more would involve serious constitutional difficulties, the court will reject those interpretations in favor of a construction that will sustain the constitutionality of the statute. *Grant v. Spellman*, 99 Wn.2d 815, 819, 664 P.2d 1227 (1983). *See also* 2A NORMAN J. SINGER, STATUTES AND STATUTORY CONSTRUCTION § 45.11, at 75 (6th ed. 2000).

■ ¶24 Former RCW 26.26.040(1)(e) provides that a man is presumed to be the natural father of a child for all intents and purposes if he acknowledges his paternity of the child pursuant to former RCW 70.58.080. Former RCW 70-.58.080(4) contains the rules regarding how an unmarried mother and the father complete an affidavit acknowledging paternity of the father. The affidavit must contain (i) a sworn statement by the mother consenting to the assertion of paternity and stating that he is the natural father of the child; (ii) a statement by the father that he is the natural father of the child; (iii) a sworn statement by the

mother and the putative father that each has been given notice, both orally and in writing, of the alternatives to, the legal consequences of, and the rights and responsibilities that arise from signing the affidavit acknowledging paternity and the social security numbers of both parents. Former RCW 70.58.080(4)(a). It is undisputed that the paternity affidavit completed by Brock and Kepl in 1998 for JMK meets all of the above requirements.

¶25 The law then provides that an acknowledgment of paternity under former RCW 70.58.080 "shall be a legal finding of paternity of the child sixty days after the acknowledgment is filed with the center for health statistics unless the acknowledgment is sooner rescinded or challenged." Former RCW 26.26.040(1)(e). It is undisputed that in this case the paternity affidavit was filed with the center for health statistics and that Kepl did not rescind or challenge the paternity affidavit within 60 days after filing. Accordingly, we hold that, as a matter of law, Kepl became the natural father of JMK in 1999, 60 days after the paternity affidavit was filed. The law provides further that "[j]udicial and administrative proceedings are neither required nor permitted to ratify an unchallenged acknowledgment of paternity filed after July 27, 1997." Former RCW 26-.26.040(1)(e). Therefore, as this paternity affidavit was filed after July 27, 1997, there is no further legal action necessary, required, or permitted by this court (or any court) regarding the legal determination that Kepl is the father of JMK.

¶26 Assuming former RCW 26.26.050(2) applies, Kepl contends that former RCW 70.58.080(4) allows only a "natural" father to sign an affidavit of paternity and that he cannot be a natural father because former RCW 26-.26.050(2) provides that unless a donor of semen signs a consent to paternity, such a donor is not the "natural" father of the child conceived using artificial insemination. Kepl's argument is not persuasive. As discussed above, under former RCW 26.26.040(1)(e), Kepl became the natural father of JMK 60 days after the signed paternity affidavit was

filed with the center for health statistics. Thus, through his actions and operation of law, Kepl has waived any rights to possible statutory protection under former RCW 26-.26.050(2) regarding his paternity of JMK. Moreover, contrary to Kepl's claim, this interpretation is consistent with the overall statutory scheme of encouraging parental responsibility for married and unmarried parents. *See, e.g.,* former RCW 26.26.020 (the parent and child relationship extends equally to every child and to every parent, regardless of the marital status of the parents); former RCW 70-.58.080 (requiring all attending physicians and midwives to provide an opportunity for a child's mother and father to complete an affidavit acknowledging paternity, formally accepting their statutory and common law duty to provide support for their child); former RCW 26.26.180 (1983) (a promise to render support by a supposed or alleged father does not require consideration and is enforceable according to its terms).

¶27 Former RCW 26.26.050 is an exception to the long-standing rule that a parent is the biological mother or father of his or her child and has a duty to support that child. 19 KENNETH W. WEBER, WASHINGTON PRACTICE: FAMILY AND COMMUNITY PROPERTY LAW ch. 21 (1997). The duty to support children exists regardless of marital status. 19 WEBER, *supra,* § 21.2, at 443 n.6 (citing *State v. Booth,* 15 Wn. App. 804, 807, 551 P.2d 1403 (1976) (" 'we are not disposed to treat the illegitimate child so differently from the legitimate child caught in the backwash of his parents' separation. In all sense of justice and equity, any such distinction, at least as to the right of parental support, belongs to a bygone day' ") (quoting *State v. Coffey,* 77 Wn.2d 630, 635, 465 P.2d 665 (1970))). *See also Kaur v. Chawla,* 11 Wn. App. 362, 522 P.2d 1198 (1974) (recognizing that an illegitimate child has a common law right to support from his or her putative father).

¶28 Furthermore, Kepl's contention raises serious constitutional concerns. Under Kepl's theory, a written agreement for paternity and legal responsibility including finan-

cial support between an unmarried couple, the mother and biological father, evidenced by a signed paternity acknowledgment, would not be sufficient to establish fatherhood responsibilities. Commentators have noted that serious constitutional concerns regarding the treatment of illegitimate children and their fathers led to the creation of the Uniform Parentage Act, chapter 26.26 RCW. *See, e.g.,* Sheila A. Malloy, Comment, *Washington's Parentage Act: A Step Forward for Children's Rights,* 12 GONZ. L. REV. 455 (1976-77) (the Act's purpose is to give full equality to all children by recognizing their right to parental support and their legal relationship with both parents (citing *Gomez v. Perez,* 409 U.S. 535, 538, 93 S. Ct. 872, 35 L. Ed. 2d 56 (1973) (holding the state could show no constitutionally sufficient justification for refusing to recognize illegitimate children's enforceable right to support from their biological fathers when the state recognized such right with respect to legitimate children))); *Stanley v. Illinois,* 405 U.S. 645, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972) (holding an Illinois statute's irrebuttable presumption that all unmarried fathers were unqualified to raise their children, a violation of the due process clause)). *See also* Carol DeNardo Spoor, Comment, *Paternity Determinations in Washington: Balancing the Interests of All Parties,* 8 U. PUGET SOUND L. REV. 653 (1984-85) (citing numerous United States Supreme Court opinions including *Levy v. Louisiana,* 391 U.S. 68, 71, 88 S. Ct. 1509, 20 L. Ed. 2d 436 (1968) (state may not create a right of action for the wrongful death of a parent that is available solely to marital children); *Weber v. Aetna Cas. & Sur. Co.,* 406 U.S. 164, 175-76, 92 S. Ct. 1400, 31 L. Ed. 2d 768 (1972) (state may not exclude nonmarital children from sharing equally with other children in workers' compensation benefits following the death of their parent)). Accordingly, we hold that Kepl became the legal (natural) father of JMK 60 days after the paternity affidavit, signed by Brock, the mother, and Kepl, the biological father, was filed.

¶29 Lastly, Kepl argues that summary judgment was not appropriate as to his paternity of JMK because there are

unresolved issues regarding credibility as to whether Kepl signed the paternity affidavit under blackmail, duress, and/or fraud. Under former RCW 26.26.040(1)(e), Kepl has the burden of proof. Based on overwhelming evidence, including the numerous photographs, letters, and cards submitted and the undisputed fact of the long-term, romantic relationship between the parties, we affirm the trial court's summary judgment determination of paternity of JMK because reasonable minds would not conclude that Kepl signed the paternity affidavit for JMK under fraud, duress, and/or blackmail.

¶30 We now turn to DRK. Because Kepl did not sign a paternity affidavit for DRK, the legal argument above is not available regarding the paternity of DRK. Kepl maintains that he cannot be the legal (natural) father of DRK because former RCW 26.26.050(2), the artificial insemination statute, shields him from legal fatherhood status.

¶31 A threshold question is whether former RCW 26-.26.050 is applicable given that Brock conceived DRK using in vitro fertilization and not through artificial insemination.[7] Brock argues that under former RCW 26.26.050(2), the legislature enacted a provision designed to prevent an unintended paternity through "artificial insemination." Brock asserts that, "by its terms, the statute is limited to the process of 'artificial insemination.' " Requested Suppl. Br. of Pet'r at 3.

---

[7] This court requested additional briefing on the issue of whether former RCW 26.26.050(2) applies in the case of semen provided to a licensed physician for use in embryonic implantation (in vitro fertilization) of a woman. Both parties provided supplemental briefs.

In his supplemental brief, Kepl's counsel claimed that Kepl was "unsure" of the reproductive process used by Brock, citing Kepl's earlier declaration in which he stated that he had no knowledge or information about the medical procedures, in part because he did not attend the medical appointments. However, his pleadings and statements at hearings are more clear on his understanding. For example, in his response to Brock's paternity action, Kepl asserted:

> The Mother [Brock] was impregnated with a fertilized embryo using donated eggs and it is possible that the donated sperm was obtained from me. The mother may also have been impregnated by another donor's sperm. Therefore, I am requesting blood tests be performed on both children.

CP at 67. Additionally, Brock and Kepl currently have seven frozen preembryos in common.

¶32 Brock correctly notes that the process of artificial insemination is completely different from the process of in vitro fertilization. *See supra* note 2. Because Brock conceived her children through the creation of embryos that were later implanted into Brock's uterus, Brock concludes that under a plain reading of the unambiguous statutory language, former RCW 26.26.050(2) does not apply to this case. Brock also cites the commentary to the Uniform Parentage Act, on which the statutory provision is based, which provides in part that the Act " 'does not deal with many complex and serious legal problems raised by the practice of artificial insemination' " and deals only with one fact situation that occurs frequently—the artificial insemination with sperm from donors who have no intention of being the father. Requested Suppl. Br. of Pet'r at 4.

¶33 Kepl provides two arguments as to why the former artificial insemination statute should apply in this case. First, Kepl claims that former RCW 26.26.050(2) should be read by focusing on the "purpose" of the donor and not on the actual method used by the woman to become pregnant. Kepl claims that since "artificial insemination" is not defined in the statute, a donor, such a Kepl, who donates semen to a licensed physician with a purpose of "for use" in a woman is entitled to the protection of the statute, regardless of the method actually employed to achieve pregnancy.

¶34 Alternatively, Kepl argues that if a definition of "artificial insemination" is required, it is appropriate to consider the current statutory provision of RCW 26.26-.011(4). RCW 26.26.011(4) defines "Assisted reproduction" to mean "a method of causing pregnancy other than sexual intercourse." The term includes "(a) intrauterine insemination; (b) donation of eggs; (c) donation of embryos; (d) in vitro fertilization and transfer of embryos; and (e) intracytoplsmic sperm injection." *Id.* Kepl claims that RCW 26-.26.011(4) is both curative and remedial and it is thus appropriate to apply the statute retroactively. Kepl relies on *Barstad v. Stewart Title Guaranty Co.*, 145 Wn.2d 528, 536, 541, 39 P.3d 984 (2002) (applying RCW 48.29.010 retroac-

tively because it is curative and intended by the legislature to apply retroactively).

¶35 Neither of Kepl's arguments is persuasive. The first argument requires this court to effectively ignore the term "artificial insemination." Courts are not permitted to simply ignore terms in a statute. *Arborwood Idaho, L.L.C. v. City of Kennewick*, 151 Wn.2d 359, 367, 89 P.3d 217 (2004) (if the statute's meaning is plain on its face, then the court must give effect to that plain meaning as an expression of legislative intent). While Kepl correctly explains the holding in *Barstad,* his second argument overlooks the legislature's clear intent in this case to apply the revised parentage provisions in chapter 26.26 RCW prospectively. RCW 26-.26.904, a transitional provision, provides, "[a] proceeding to adjudicate parentage which was commenced before June 13, 2002, is governed by the law in effect at the time the proceeding was commenced." Thus, the legislature did not intend the new parentage provisions to apply retroactively. Accordingly, we hold that former RCW 26.26.050(2) is not applicable.

¶36 Next, Kepl contends that the trial court lacked authority to order blood tests. Former RCW 26.26.100(1) provides, in relevant part, that the court may, and upon the request of a party shall, require any alleged or presumed father who has been made a party to submit to blood tests. If a party objects to a proposed court order for blood or genetic tests, the party requesting blood tests must provide testimony stating the facts and the court is then required to order blood tests if it appears that a reasonable possibility exists that the requisite sexual contact occurred. Former RCW 26.26.100. Kepl claims that the court had no authority because former RCW 26.26.050(2) shields him from legal paternity for JMK and DRK.

¶37 As discussed above, with regard to both JMK and DRK, Kepl does not have recourse to any statutory defenses under former RCW 26.26.050(2). Furthermore, in response to Brock's parentage petition, Kepl initially claimed that he was not necessarily the biological father of the two boys

because Brock may have been "impregnated by another donor's sperm," and Kepl himself requested blood testing for paternity of both boys. Given Kepl's shifting legal position, combined with the intimate, sexual relationship between the parties and the inapplicability of former RCW 26-.26.050, we hold that the trial court did not abuse its discretion in ordering Kepl to submit to blood tests.[8]

¶38 As noted earlier, genetic testing here indicates a 98 percent or greater probability that Kepl is DRK's biological father. There is no dispute as to the procedures or accuracy of the genetic testing. Thus, under former RCW 26-.26.040(1)(g), Kepl is presumed to be the natural father of DRK. Accordingly, we affirm the trial court's summary judgment determination that Kepl is the legal (natural) father of DRK.

¶39 Kepl also claims that the trial court erred in requiring Kepl to pay child support and to provide tax returns because he is not the natural father under former RCW 26.26.050(2). Because we hold that Kepl is the natural father of both boys, Kepl's claims are without merit. Orders setting forth child support obligations in paternity actions are reviewed for abuse of discretion. *State ex rel. Partlow v. Law,* 39 Wn. App. 173, 178, 692 P.2d 863 (1984). RCW 26.26.130(2) provides that the judgment and order regarding parentage shall contain provisions concerning the duty of future and current child support. Kepl makes no claim that the amount of support determined by the court was not reasonable or that the court failed to consider relevant factors. RCW 26.26.130(6) (after considering all relevant factors, the court shall order either or both parents to pay an amount determined pursuant to the schedule and standards contained in chapter 26.19 RCW). The record contains the Washington State Child Support Schedule Worksheets used to determine the support payments. We

---

[8] It is well-settled law that in the context of blood testing for paternity, the state has a compelling interest in safeguarding the constitutional rights of a child and protecting the interests of its taxpayers. *See, e.g., State v. Meacham,* 93 Wn.2d 735, 737-40, 612 P.2d 795 (1980) (citing *Gomez,* 409 U.S. at 538).

hold that the trial court did not abuse its discretion in determining child support.[9]

## ATTORNEY FEES

¶40 Kepl also contends that the trial court erred when it ordered him to pay $3,500 of Brock's $5,000 in attorney fees. Kepl claims that the trial court should be reversed because both the superior court commissioner and the trial court failed to enter findings and conclusions in support of the temporary order and in support of the order denying motion for revision of the order granting attorney's fees and child support. Kepl claims that the lack of findings and conclusions prevents effective review and constitutes reversible error, citing *In re Estate of Larson*, 103 Wn.2d 517, 520 n.1, 694 P.2d 1051 (1985). Kepl's argument is not persuasive.

■■ ¶41 In *Larson*, a case involving a dispute over attorney fees incurred in the probate of an estate, the court noted in a footnote that "superior courts, in reviewing decisions of court commissioners pursuant to RCW 2.24-.050, should enter . . . findings of fact and conclusions of law into the record." *Larson,* 103 Wn.2d at 520 n.1. However, the court did not hold that failure to enter findings of fact and/or conclusions of law prevents effective review in all cases or constitutes reversible error. In this case, RCW 26.26.140 provides that "[t]he court may order that all or a portion of a party's reasonable attorney's fees be paid by another party." The trial court is granted broad discretion in determining an award of attorney fees under RCW 26.26.140. *State ex rel. T.A.W. v. Weston*, 66 Wn. App. 140, 831 P.2d 771 (1992). We will not disturb the trial court's award unless it was manifestly unreasonable or based on untenable grounds. *Fernando v. Nieswandt*, 87 Wn. App. 103, 110, 940 P.2d 1380 (1997). Looking at the

---

[9] Lastly, Kepl contends that the trial court erred in granting only partial relief to his motion to lift the protective order for Brock's medical records. We do not address this issue because Kepl's biological paternity has already been established through genetic testing.

record as a whole, we cannot say that the trial court abused its discretion. When discussing Brock's request for attorney fees, Brock's counsel explained the procedural history of the case and the tremendous amount of work required due to Kepl's actions. RP at 7-8 (Sept. 18, 2002) (noting Kepl's numerous motions for revision, blatant violations of rules regarding medical records, delay in seeking blood tests, and refusal to provide timely financial information). Brock's counsel also noted the vastly different financial positions of the parties. Given the sufficient record and the broad discretion granted to trial courts to award attorney fees in parentage actions, we affirm the trial court's award of attorney fees.

■ ¶42 Brock is requesting attorney fees on appeal, citing RAP 18.1 and RCW 26.26.140. Kepl asserts that Brock's request for attorney fees should be denied because Brock did not provide an extensive argument, citing *Faulkner v. Racquetwood Village Condominium Association*, 106 Wn. App. 483, 487, 23 P.3d 1135 (2001); *Department of Labor & Industries v. Kaiser Aluminum & Chemical Corp.*, 111 Wn. App. 771, 788, 48 P.3d 324 (2002); *Thweatt v. Hommel,* 67 Wn. App. 135, 147-48, 834 P.2d 1058 (1992) for authority. These cases do not support Kepl's argument. *See, e.g., Faulkner*, 106 Wn. App. at 487 (providing that a request for attorney fees pursuant to RAP 18.1 is insufficient when the party failed to cite the applicable law that grants them attorney fees). In this case, unlike in the cases cited by Kepl, Brock appropriately identified the applicable law. Pursuant to RCW 26.26.140, this court has broad discretion to award attorney fees. Based on the facts of this case, we grant Brock's request for attorney fees for the appeal.

ALEXANDER, C.J., and C. JOHNSON, BRIDGE, CHAMBERS, OWENS, FAIRHURST, and J.M. JOHNSON, JJ., concur.

SANDERS, J., concurs in the result.