143 P.3d 571 (2006)
Greg AMUNRUD, Petitioner,
v.
BOARD OF APPEALS and the Department of Social and Health Services, State of Washington, Respondents.
No. 76590-1.
Supreme Court of Washington, En Banc.
Argued November 9, 2005.
Decided September 21, 2006.
*572 Robert Harold Stevenson, Seattle, for Petitioner/Appellant.
Lianne Schain Malloy, Jay Douglas Geck, Office of the Attorney General, Olympia, for Appellee/Respondents.
MADSEN, J.
¶ 1 Greg Amunrud challenges a decision by the Court of Appeals affirming an order from the Department of Social and Health Services (DSHS) suspending his commercial driver's license for failing to pay child support for his son. He claims that he was denied procedural due process prior to the suspension because he was not given a "meaningful" hearing. He also claims that he has a fundamental economic right to pursue an occupation as a taxi driver and that suspension of his commercial driver's license under RCW 74.20A.320 does not survive strict scrutiny, contravening substantive due process.
¶ 2 We hold that Amunrud was given a meaningful opportunity to be heard prior to and postsuspension of his commercial driver's license consistent with procedural due process. Further, consistent with long-standing law, we apply a rational basis test and hold that the enforcement of child support obligations is a legitimate state interest and RCW 74.20A.320 is rationally related to that interest. We affirm the Court of Appeals, finding that Amunrud received due process consistent with the federal and state constitutions.

FACTS
¶ 3 In 1996, the United States Congress enacted Title III of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA), 42 U.S.C. § 1305, which imposed greater federal oversight over the states' participation in the Child Support Enforcement Act, 42 U.S.C. §§ 651-69. While states are not required to participate in the Child Support Enforcement Program, in order for a state to receive the federal block grant under the Temporary Assistance to Needy Families Program and federal money to assist in collecting child support under PRWORA, the state must operate a child support enforcement program that meets federal requirements. See Kansas v. United States, 214 F.3d 1196, 1197 (10th Cir.), cert. denied, 531 U.S. 1035, 121 S.Ct. 623, 148 L.Ed.2d 533 (2000). A state "shall have in effect all of the laws to improve child support enforcement effectiveness which are referred to in [42 U.S.C. § 666]." 42 U.S.C. § 654(20)(A). Under 42 U.S.C. § 666(a)(16), a state must establish procedures under which it would have the "authority to withhold *573 or suspend, or to restrict the use of driver's licenses, professional and occupational licenses, and recreational and sporting licenses of individuals owing overdue support or failing, after receiving appropriate notice, to comply with subpoenas or warrants relating to paternity or child support proceedings."
¶ 4 In 1997, the Washington State Legislature established a program by which certain licenses may be suspended if a responsible parent is six months or more in arrears on child support payments. Laws of 1997, ch. 58, § 801. RCW 74.20A.320 allows DSHS to serve on a responsible parent the department's intent to seek revocation of a license of the parent. A parent may request a hearing to contest the issue of compliance with the child support order, but the issues in the adjudicative proceeding are limited to whether the parent is required to pay child support and whether the parent is in compliance with that order. RCW 74.20A.320(2)(a). "[I]f the parent agrees to make timely payments of current support and agrees to a reasonable payment schedule for the payment of the arrears," the department will stay the action to certify the parent to the department of licensing. RCW 74.20A.320(2)(e). The Division of Child Support (DCS) must take into account the financial situation of the parent and the needs of the children when setting the repayment amount. WAC 388-14A-4520(4). Furthermore, RCW 74.20A.320 does not prohibit the "parent from filing a motion to modify support with the court or from requesting the department to amend a support obligation established by an administrative decision[, and i]f there is a reasonable likelihood that a pending motion or request will significantly change the amount of the child support obligation, the department or the court may stay action to certify the responsible parent to the department of licensing." RCW 74.20A.320(11).
¶ 5 In conjunction with a paternity action filed in November 1997, Amunrud was ordered to pay $350 per month in child support for his son. Initially, Amunrud paid $150 per month, but in January 1998, he began to pay only $75 per month and also made occasional payments of $50 or $100 per month. He was cited for contempt several times for failing to pay child support.
¶ 6 In 2002, with assistance from the prosecutor's office, Amunrud petitioned the court for a modification of child support. Rather than reducing the child support obligation, the court ordered Amunrud to pay $421 per month (the standard calculation). The order of child support notified Amunrud that his privilege to maintain a driver's license or a license to engage in a profession may be suspended under chapter 74.20A RCW if he failed to comply with the order. Amunrud did not appeal the support order, and he has not sought to modify it.
¶ 7 By April 2002, Amunrud was $16,255 in arrears on his child support payments. On April 9, 2002, the DCS sent Amunrud a notice of noncompliance and intent to suspend licenses. Certified Appeal Bd. R., ex. 3, at 34. Amunrud requested a hearing, which was held on June 18, 2002. In upholding the department's decision to suspend Amunrud's license, the administrative law judge (ALJ) found that Amunrud was the noncustodial parent named in the court orders requiring him to pay child support and that he was at least six months in arrears under each of the orders.
¶ 8 Amunrud appealed the initial suspension order, arguing that the ALJ's decision violated his rights to equal protection and due process by depriving him of his means to make a living by driving a taxi.[1]
¶ 9 The DSHS Board of Appeals affirmed the ALJ's decision, finding no irregularities in the proceedings affecting the fairness of the hearing. The Board of Appeals did not address Amunrud's arguments regarding validity of the underlying superior court order for child support, opining that it did not have *574 the authority to do so. Amunrud's request for reconsideration was denied. On appeal, the King County Superior Court affirmed the decision of the Board of Appeals.
¶ 10 The Court of Appeals affirmed the decision of the superior court. Amunrud v. Dep't of Soc. & Health Servs., 124 Wash.App. 884, 103 P.3d 257 (2004). First, the court held that RCW 74.20A.320 does not violate Amunrud's right to substantive due process under the rational basis test. The court specifically noted that license suspension, or threat of license suspension, had proved an effective child support enforcement tool, resulting in over $48.5 million in voluntary payments from October 2001 to September 2003. Id. at 890, 10, 103 P.3d 257. Second, the court found that Amunrud's right to procedural due process was not violated because Amunrud was provided an administrative hearing and was able to challenge the underlying amount of support through modification.

ANALYSIS
¶ 11 Amunrud challenges DSHS's order suspending his commercial driver's license for failing to pay child support pursuant to RCW 74.20A.320 on two bases: he claims that he was denied a meaningful opportunity to challenge the suspension in violation of his right to procedural due process, and he contends that the statute upon which the suspension rests violates substantive due process because it impinges on his fundamental right to pursue a profession or occupation.
¶ 12 Constitutional challenges are questions of law subject to de novo review. City of Redmond v. Moore, 151 Wash.2d 664, 668, 91 P.3d 875 (2004). This court shall grant relief from an agency order if we determine that "[t]he order, or the statute or rule on which the order is based, is in violation of constitutional provisions on its face or as applied." RCW 34.05.570(3)(a). Statutes are presumed to be constitutional, and the burden to show unconstitutionality is on the challenger. In re Marriage of Johnson, 96 Wash.2d 255, 258, 634 P.2d 877 (1981). A party challenging a statute's constitutionality bears the heavy burden of establishing its unconstitutionality. Larson v. Seattle Popular Monorail Auth., 156 Wash.2d 752, 757, ¶ 9, 131 P.3d 892 (2006) (citing Amalgamated Transit Union Local 587 v. State, 142 Wash.2d 183, 205, 11 P.3d 762, 27 P.3d 608 (2000); Aetna Life Ins. Co. v. Wash. Life & Disability Ins. Guar. Ass'n, 83 Wash.2d 523, 528-29, 520 P.2d 162 (1974); Hemphill v. Tax Comm'n, 65 Wash.2d 889, 891, 400 P.2d 297 (1965)). This standard is met if argument and research show that there is no reasonable doubt that the statute violates the constitution. Larson, 156 Wash.2d at 757, ¶ 9, 131 P.3d 892 (citing Amalgamated Transit, 142 Wash.2d at 205, 11 P.3d 762); Johnson, 96 Wash.2d at 258, 634 P.2d 877; Aetna, 83 Wash.2d at 528-29, 520 P.2d 162; Clark v. Dwyer, 56 Wash.2d 425, 431, 353 P.2d 941 (1960). See also Parrish v. W. Coast Hotel Co., 185 Wash. 581, 597, 55 P.2d 1083 (1936) (statute must be unconstitutional "beyond question"), aff'd, 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703 (1937); Nebbia v. New York, 291 U.S. 502, 537-38, 54 S.Ct. 505, 78 L.Ed. 940 (1934) (every possible presumption is in favor of a statute's validity, and that although a court may hold views inconsistent with the wisdom of a law, it may not be annulled unless "palpably" in excess of legislative power).

Procedural Due Process
¶ 13 We first address Amunrud's procedural due process claim. The United States Constitution guarantees that federal and state governments will not deprive an individual of "life, liberty, or property, without due process of law." U.S. CONST. amends. V, XIV, § 1.[2] The due process clause of the Fourteenth Amendment confers both procedural and substantive protections. Albright v. Oliver, 510 U.S. 266, 114 S.Ct. *575 807, 127 L.Ed.2d 114 (1994). When a state seeks to deprive a person of a protected interest, procedural due process requires that an individual receive notice of the deprivation and an opportunity to be heard to guard against erroneous deprivation. Mathews v. Eldridge, 424 U.S. 319, 348, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). The opportunity to be heard must be "`at a meaningful time and in a meaningful manner,'" appropriate to the case. Id. at 333, 96 S.Ct. 893 (quoting Armstrong v. Manzo, 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965)). It is well settled that driver's licenses are property interests protected by procedural due process. Moore, 151 Wash.2d at 670, 91 P.3d 875; Mackey v. Montrym, 443 U.S. 1, 10, 99 S.Ct. 2612, 61 L.Ed.2d 321 (1979) (suspension of a driver's license implicates a "protectible property interest;" finding that due process did not require a hearing prior to suspension of a driver's license for refusing to take a Breathalyzer test); Dixon v. Love, 431 U.S. 105, 112-16, 97 S.Ct. 1723, 52 L.Ed.2d 172 (1977) (suspension of issued driver's licenses protected by due process, finding that due process did not require a hearing prior to suspension for repeated convictions of traffic offenses); Bell v. Burson, 402 U.S. 535, 539, 91 S.Ct. 1586, 29 L.Ed2d 90 (1971) (explaining that "[o]nce [driver's] licenses are issued,... their continued possession may become essential in the pursuit of a livelihood" and thus "are not to be taken away without that procedural due process required by the Fourteenth Amendment;" finding that due process required a hearing prior to suspension of driver's license).
¶ 14 Principally relying on this court's decision in Moore, 151 Wash.2d 664, 91 P.3d 875, Amunrud argues that his right to procedural due process was violated because he was not afforded a "meaningful" hearing prior to his license being suspended. Specifically, Amunrud maintains that his hearing in front of the ALJ was not meaningful because Amunrud was not given an opportunity to show the reasons for the inability to pay the arrearages that might negate the necessity for his license revocation.
¶ 15 In Moore, this court examined a procedural due process challenge to former RCW 46.20.289 (2002), which provided for mandatory license suspension for failing to respond to a notice of traffic infraction, and former RCW 46.20.324(1) (1965), which denied an administrative hearing when the license suspension or revocation was mandatory. As this court held, a license suspension or revocation violates due process, absent the opportunity to be heard "`at a meaningful time and in a meaningful manner.'" Id. at 670, 91 P.3d 875 (quoting Mathews, 424 U.S. at 333, 96 S.Ct. 893).
¶ 16 In determining whether the procedures under former RCW 46.20.289 and.324(1) were adequate to protect the due process interest at stake, we employed the Mathews balancing test. First, we found the private interest in a driver's license is substantial because such a deprivation can severely affect the person's ability to earn a living. Moore, 151 Wash.2d at 670, 91 P.3d 875. Additionally, the duration of the deprivation could be extensive because the person is not guaranteed a prompt hearing to contest the suspension or revocation under the statute. Second, because the license suspension or revocation was automatic, there was a possibility that error in a conviction record could result in the revocation of the license of an innocent motorist. Id. at 672, 91 P.3d 875. The right to due process requires the opportunity for a meaningful administrative hearing prior to revocation of the driver's license. Id. We found it particularly persuasive that there was no postdeprivation right to appeal from the suspension, and even if there was a hearing to correct the error, there is no provision allowing for a stay of the suspension or revocation pending the outcome of the hearing. Id. at 673, 91 P.3d 875.
¶ 17 Amunrud's reliance on Moore is misplaced. Unlike the former RCW 46.20.289 and .324(1), RCW 74.20A.320 provides a person with the opportunity for an administrative hearing in order to challenge the driver's license suspension. Additionally, unlike the statutes at issue in Moore, Amunrud has a right to appeal the license suspension. The procedures set forth in RCW 74.20A.320 also allow for a stay of the suspension pending the outcome of the hearing and for up to six months pending the outcome of a child support *576 modification hearing under WAC 388-14A-4515. Finally, Amunrud could obtain a release of his driver's license suspension from DCS by signing a repayment agreement under WAC 388-14A-4520. See WAC 388-14A-4525.
¶ 18 As to Amunrud's final contention that the Board did not consider his unusual circumstances and thus, he was denied "meaningful" review, his argument is without merit. First, Amunrud could have appealed the March 29, 2002, order that raised his child support payment to $421 per month. Second, Amunrud could again file a motion to modify support with the court. Amunrud was $16,255 in arrears on his child support payments and was made aware that failure to make payments could result in the suspension of his driver's license. Because Amunrud was given an opportunity to be heard at a meaningful time and in a meaningful manner, his right to procedural due process was not violated.

Substantive Due Process
¶ 19 We turn next to Amunrud's substantive due process claim. Substantive due process protects against arbitrary and capricious government action even when the decision to take action is pursuant to constitutionally adequate procedures. Halverson v. Skagit County, 42 F.3d 1257, 1261 (9th Cir.1994).
¶ 20 To determine the level of review to be applied in a due process challenge to state action, we begin with the nature of the right involved. It is well established that, once issued, professional and motor vehicle licenses create interests requiring due process protection. See, e.g., Barry v. Barchi, 443 U.S. 55, 64 n. 11, 99 S.Ct. 2642, 61 L.Ed.2d 365 (1979) (licenses issued to horse trainers were protected by due process and equal protection because "state law has engendered a clear expectation of continued enjoyment of a license absent proof of culpable conduct by the trainer"); Bell, 402 U.S. at 539, 91 S.Ct. 1586 (procedural due process protection). Likewise, the United States Supreme Court has held that pursuit of an occupation or profession is a liberty interest protected by the due process clause. Conn v. Gabbert, 526 U.S. 286, 291-92, 119 S.Ct. 1292, 143 L.Ed.2d 399 (1999) (the "Fourteenth Amendment's Due Process Clause includes some generalized due process right to choose one's field of private employment"); Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 572, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). See also Dittman v. California, 191 F.3d 1020, 1029 (9th Cir.1999), (the pursuit of profession or occupation is a protected liberty interest that extends across a broad range of lawful occupations), cert. denied, 530 U.S. 1261, 120 S.Ct. 2717, 147 L.Ed.2d 982 (2000); Cornwell v. Cal. Bd. of Barbering & Cosmetology, 962 F.Supp. 1260, 1271 (1997) ("`[t]he right to hold specific private employment and to follow a chosen profession free from unreasonable governmental interference comes within the "liberty" and "property" concepts'" of the federal constitution (quoting Greene v. McElroy, 360 U.S. 474, 492, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959))).
¶ 21 Addressing first his substantive due process claim, Amunrud contends that the right to obtain a driver's license and to earn a living is a fundamental right under the fourteenth amendment to the United States Constitution and that the statute authorizing DSHS to suspend his license is subject to strict scrutiny. He claims that the revocation of his commercial driver's license denied him the right to earn a living as a taxi driver, his occupation for over 20 years.[3]
¶ 22 State interference with a fundamental right is subject to strict scrutiny. In re Parentage of C.A.M.A., 154 Wash.2d 52, 57, ¶ 10, 109 P.3d 405 (2005). Strict scrutiny requires that the infringement is narrowly tailored to serve a compelling state interest. Washington v. Glucksberg, 521 U.S. 702, 721, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997). The United States Supreme Court has recognized certain liberty interests protected by the due process clause *577 but not explicitly enumerated in the Bill of Rights. However, neither this court nor the United States Supreme Court has characterized the right to pursue a particular profession as a fundamental right. Instead, courts have repeatedly held that the right to employment is a protected interest subject to rational basis review. As mentioned above, the United States Supreme Court recently explained that:
[T]he liberty component of the Fourteenth Amendment's Due Process Clause includes some generalized due process right to choose one's field of private employment, but a right which is nevertheless subject to reasonable government regulation.

Conn, 526 U.S. at 291-92, 119 S.Ct. 1292 (emphasis added). And the United States Supreme Court has made clear that "rational basis review" is the appropriate standard for reviewing such government licensing regulations. Barry, 443 U.S. at 61-62, 67-68, 99 S.Ct. 2642 (applying "rational basis" test in the equal protection context and upholding the regulation because the plaintiff did not establish that "`the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker'") (quoting Vance v. Bradley, 440 U.S. 93, 111, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979)). See also Medeiros v. Vincent, 431 F.3d 25, 29 n. 3 (1st Cir.2005) (explaining that it is "well-settled" that there is no fundamental right to pursue a livelihood or occupation and "that legislation or regulation impinging upon such a right therefore is subject only to `rational basis' review, rather than `strict scrutiny'"); Cornwell, 962 F.Supp. at 1271-72 (substantive due process challenges to regulations of occupations are "subjected to rational basis review" and "[t]he regulation may only be struck down if there is no rational connection between the challenged statute and a legitimate government objective"); Mass. Bd. of Ret. v. Murgia, 427 U.S. 307, 313-14, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976) (no fundamental right to government employment and applying rational basis review to restrictions on government employment); Schware v. Bd. of Bar Examiners of N.M., 353 U.S. 232, 238, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957) (no fundamental right to practice law); Nebbia, 291 U.S. at 527-28, 54 S.Ct. 505 (the right to work in a particular profession or trade is a protected right and subject to rational regulation); Dittman, 191 F.3d at 1031 (applying rational basis review to requirements for acupuncture license); Meyers v. Newport Consol. Joint Sch. Dist. No. 56-415, 31 Wash. App. 145, 639 P.2d 853 (1982) (holding that the right to employment is not fundamental and applying rational basis review); In re Revocation of License to Practice Medicine & Surgery of Kindschi, 52 Wash.2d 8, 319 P.2d 824 (1958) (applying rational basis review to license revocation).
¶ 23 Other states have ruled in accord. See, e.g., In re Revocation of License of Polk, 90 N.J. 550, 564, 570, 449 A.2d 7 (1982) (while a professional license embraces a substantial individual interest which deserves protection, "it cannot be equated with a fundamental right," (emphasis added) requiring only compelling state interests for justification; such licenses are "`always subject to reasonable regulation in the public interest'") (quoting B. Jeselsohn, Inc. v. Atlantic City, 70 N.J. 238, 242, 358 A.2d 797 (1976)); Petition of Grimm, 138 N.H. 42, 50, 635 A.2d 456 (1993) ("[t]he right to work in one's occupation has never been placed on equal footing with fundamental personal rights," applying rational basis review for equal protection challenge to regulation affecting the licensing of medical doctors). Thus, while it is clear that pursuing a lawful private profession or occupation is a protected right under the state and federal constitutions, it is equally clear that such right is not a fundamental right, requiring heightened judicial scrutiny.[4]
¶ 24 When state action does not affect a fundamental right, the proper standard of review is rational basis. JOHN E. NOWAK & RONALD D. ROTUNDA, CONSTITUTIONAL *578 LAW § 11.4, at 370; § 14.4, at 601 (4th ed.1991); Glucksberg, 521 U.S. at 728, 117 S.Ct. 2258. Under this test, the challenged law must be rationally related to a legitimate state interest. Id.; Seeley v. State, 132 Wash.2d 776, 795, 940 P.2d 604 (1997); In re Pers. Restraint of Metcalf 92 Wash.App. 165, 963 P.2d 911 (1998), cert. denied, 527 U.S. 1041, 119 S.Ct. 2405, 144 L.Ed.2d 803 (1999). In determining whether a rational relationship exists, a court may assume the existence of any necessary state of facts which it can reasonably conceive in determining whether a rational relationship exists between the challenged law and a legitimate state interest. Heller v. Doe, 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993); see Seeley, 132 Wash.2d at 795, 940 P.2d 604; Glucksberg, 521 U.S. 702, 117 S.Ct. 2258. Because the right to pursue a trade or profession is a protected right but not a fundamental right, we apply a rational basis test.
¶ 25 Amunrud argues, though, that even if this court concludes that only a rational basis is required to justify a professional license suspension, there is "no rational or reasonable connection between the alleged increase of child support collections by revoking his professional driver's license and greater child support collections by using such a threat." Pet. of Greg Amunrud for Review at 12. We disagree.
¶ 26 The explicit legislative purpose in enacting RCW 74.20A.320 was to create a strong incentive for those owing child support to make timely payments. See Laws of 1997, ch. 58, § 801. It is axiomatic that the enforcement of child support is a legitimate state interest. See Johnson, 96 Wash.2d at 262, 634 P.2d 877 ("[p]ublic enforcement of child support is a recognized governmental function;" "[a]s early as 1854, territorial courts were required to `make provision for the guardianship, custody and support and education of the minor children ...' upon divorce") (quoting Laws of 1854, 1st Sess., § 8, at 407); State v. Wood, 89 Wash.2d 97, 102, 569 P.2d 1148 (1977), overruled on other grounds by Sw. Wash. Chapter, Nat'l Elec. Contractors Ass'n v. Pierce County, 100 Wash.2d 109, 667 P.2d 1092 (1983) (the primary obligation for support of a child falls on his or her parents rather than on the taxpayers of this state and the state has a compelling interest in assuring parents' compliance; a court's "greatest concern is the welfare of the child and the protection of the child's fundamental right to support"); see also In re Custody of Shields, 157 Wash.2d 126, 144, 136 P.3d 117 (2006) (the State has a compelling interest in protecting children's welfare); In re Parentage of J.M.K., 155 Wash.2d 374, 389, ¶ 27, 394 n. 8, 119 P.3d 840 (2005) (long-standing rule in Washington that parents have a duty to support their children and the State has a compelling interest in safeguarding the constitutional rights of a child and protecting the interests of its taxpayers).
¶ 27 The rational basis test is the most relaxed form of judicial scrutiny. State v. Shawn P., 122 Wash.2d 553, 859 P.2d 1220 (1993). In Kindschi, this court held the State's grant of license to engage in a trade or occupation may be conditioned by the State as long as there is a rational connection between the condition and the occupation. Kindschi, 52 Wash.2d at 11, 319 P.2d 824. In that case the court found a rational connection between income tax fraud and fitness to practice medicine. Thus, the court held that the legislature properly provided for license revocation as a consequence for fraudulent conduct. Id. at 12, 319 P.2d 824.
¶ 28 Here, the condition attached to Amunrud's commercial license, which he needs in order to pursue his occupation as a taxi driver, is compliance with a lawful court order of child support. It is reasonable for the legislature to believe that Washington's license suspension scheme will provide a powerful incentive to those in arrears in their child support payments to come into compliance. Moreover, the legislature has concluded that if an individual wishes to continue to receive the financial benefit that flows from possessing a professional license granted by the State, that individual must not be permitted to burden the State by shifting the financial obligation to support his or her children to the State. In light of these considerations, we conclude that there is a rational relationship between professional license suspension *579 and the State's interest in enforcing child support orders.
¶ 29 Other courts considering this question have reached a similar conclusion. See State v. Beans, 965 P.2d 725 (Alaska 1998) (license suspension is particularly effective against child support obligors and is rationally related to legitimate state interest); Tolces v. Trask, 76 Cal.App.4th 285, 90 Cal.Rptr.2d 294 (1999) (license suspension is rational means of achieving the State's interest in enforcing child support orders); State v. Leuvoy, 2004-Ohio-2232, appeal denied, 103 Ohio St.3d 1428, 814 N.E.2d 491 (2004) (same; no substantive due process violation); Thompson v. Ellenbecker, 935 F.Supp. 1037 (S.D.1995) (no substantive due process violation because rational reasons support restriction on child support obligors' driver's licenses for nonpayment of child support).
¶ 30 Amunrud argues, though, that the law is irrational because the suspension of his commercial driver's license here is unrelated to his driving abilities. He contends that there is no evidence he is an unsafe driver. Absent such evidence, he argues, the suspension of his commercial driver's license lacks a rational connection to a legitimate state interest.
¶ 31 As explained above, RCW 74.20A.320, under which Amunrud's commercial license was suspended, promotes the State's interest in encouraging legally responsible persons to financially support their children. The statute is not concerned with safe driving, as is obvious from its application to professional and occupational licenses other than commercial driver's licenses. Thus, whether Amunrud is a safe driver is irrelevant. Accordingly, for the reasons discussed above, we hold that RCW 74.20A.320 is rationally related to a legitimate state interest and is thus consistent with substantive due process.
¶ 32 Notwithstanding the above, the dissent claims that RCW 74.20A.320 violates substantive due process protections of the federal and state constitutions. The dissent is mistaken. First, the dissent claims that Amunrud has a fundamental right to pursue an occupation that is subject to strict scrutiny by the courts. Dissent at 584-85. However, the laundry list of cases cited by the dissent as support for that proposition, most of which we cite above, does not support the proposition. The dissent fails to explain the context and reasoning of much of its cited authority which carefully points out that while the right to pursue a lawful occupation is a "protected right," it is not a fundamental right subject to strict scrutiny. For example, in Conn, the United States Supreme Court discussed numerous cases including Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923); Truax v. Raich, 239 U.S. 33, 41, 36 S.Ct. 7, 60 L.Ed. 131 (1915); Dent v. West Virginia, 129 U.S. 114, 9 S.Ct. 231, 32 L.Ed. 623 (1889), relied on by the dissent, and concluded that the liberty component of the due process clause contains only a "generalized due process right," a right that is always subject to "reasonable regulation." Conn, 526 U.S. at 291-92, 119 S.Ct. 1292. And, in Cornwell, 962 F.Supp. at 1272, a case also relied on by the dissent, the court makes clear that in evaluating an occupational licensing regulation, "[t]he regulation may only be struck down if there is no rational connection between the challenged statute and a legitimate government objective."
¶ 33 Second, the dissent attempts to modify the rational basis test by adding an additional requirement. The dissent erroneously claims this court must also evaluate whether the challenged law is "unduly oppressive on individuals," citing as primary authority, Lawton v. Steele, 152 U.S. 133, 14 S.Ct. 499, 38 L.Ed. 385 (1894) (an early land use case).[5] *580 Dissent at 582. However, as explained above, the appropriate test for the court to apply under a rational basis inquiry is whether the law bears a reasonable relationship to a legitimate state interest. See, e.g., Metcalf, 92 Wash.App. 165, 963 P.2d 911; Glucksberg, 521 U.S. at 722, 117 S.Ct. 2258; Dittman, 191 F.3d at 1030; Medeiros, 431 F.3d at 29.
¶ 34 Finally, the dissent maintains that RCW 74.20A.320 fails the rational basis test because the statute does not involve highway safety. The dissent claims that the only legitimate state interest involved in issuing commercial driver's licenses is highway safety; and since this law does not involve Amunrud's driving ability, it has no rational basis supporting it. The dissent fails to admit that Amunrud has a legal duty to support his own son and that the State has a legitimate interest in public enforcement of child support. See Johnson, 96 Wash.2d at 262-63, 634 P.2d 877 (since at least 1854, the State has been involved in ensuring children receive support); Wood, 89 Wash.2d at 102, 569 P.2d 1148 (the primary obligation for support of a child falls on his or her parents rather than on the taxpayers of this state and the State has a compelling interest in assuring parents' compliance; a court's "greatest concern is the welfare of the child and the protection of the child's fundamental right to support"); In re Custody of Shields, 157 Wash.2d at 144, 136 P.3d 117, (the State has a compelling interest in protecting children's welfare); In re Parentage of J.M.K., 155 Wash.2d at 389, ¶ 27, 394 n. 8, 119 P.3d 840 (long-standing rule in Washington that the parent of a child has a duty to support that child). Instead, the dissent equates Amunrud's failure to pay child support according to court order with failure to pay a "debt" or to license a pet, an offensive comparison, troubling in its inadequacy.
¶ 35 The condition attached to Amunrud's commercial license, which he needs in order to pursue his occupation as a taxi driver, is compliance with a lawful court order of child support. As explained above, it is reasonable for the legislature to believe that this state's license suspension scheme will provide a powerful incentive to those financially able and in arrears in their child support payments to come into compliance with a lawful court order of child support. Additionally, the legislature could reasonably conclude that if an individual wishes to continue to receive the financial benefit that flows from possessing a professional or occupational license granted by the State, that individual must not be permitted to burden the State by shifting the financial obligation to support his or her children to the taxpayers.
¶ 36 Equally troubling is the dissent's failure to acknowledge that its approach would require us to overturn nearly 100 years of case law in Washington. Much of the dissent's cited case law and argument reflects turn-of-the-century economic jurisprudence. A leading case espousing that jurisprudence was Lochner v. New York, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905),[6] in which elected legislatures were viewed as having limited power (police power) to enact laws providing for health, safety, and welfare of their citizens. In Lochner, the court found a state law providing a 60-hour workweek for bakers unconstitutional, based on the view that the law was outside of the police power of the state legislature to protect workers and interfered with the "liberty" interest of the employees and employers to contract for more than 60-hour workweeks. Lochner, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937.
¶ 37 This jurisprudence has been soundly rejected by the United States Supreme Court and this court. See, e.g., Williamson v. Lee Optical of Okla., 348 U.S. 483, 488, 75 S.Ct. 461, 99 L.Ed. 563 (1955) ("[t]he day is gone when this Court uses the Due Process *581 Clause of the Fourteenth Amendment to strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought"); Ferguson v. Skrupa, 372 U.S. 726, 730, 83 S.Ct. 1028, 10 L.Ed.2d 93 (1963) (the Court announced it was returning "to the original constitutional proposition" enunciated in Munn v. Illinois, 94 U.S. (4 Otto) 113, 24 L.Ed. 77 (1876), "that courts do not substitute their ... economic beliefs for the judgment of legislative bodies"); W. Coast Hotel, 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703 (affirming this court and overruling Lochner and its line of cases). In West Coast Hotel, a watershed case arising from our own state upholding minimum wage laws, the United States Supreme Court explained that "liberty" safeguarded by the constitution is
liberty in a social organization which requires the protection of law against the evils which menace the health, safety, morals and welfare of the people. Liberty under the Constitution is thus necessarily subject to the restraints of due process, and regulation which is reasonable in relation to its subject and is adopted in the interests of the community is due process.

Id. at 391, 57 S.Ct. 578 (emphasis added). See also Slaughter-House Cases, 83 U.S. (16 Wall.) 36, 21 L.Ed. 394 (1872); Nebbia, 291 U.S. at 537, 54 S.Ct. 505 (legislatures are "free to adopt whatever economic policy may reasonably be deemed to promote public welfare;" the "wisdom of the policy adopted, with the adequacy or practicability of the law enacted to forward it, the courts are both incompetent and unauthorized to deal").
¶ 38 The dissent also fails to acknowledge that this court has been a historical, long-standing leader in protecting individual's rights, especially those of the economically powerless. For example, in State ex rel. Davis-Smith Co. v. Clausen, 65 Wash. 156, 178, 117 P. 1101 (1911), this court was the first court to uphold workers' compensation legislation, providing injured workers with compensation when injured on the job. See, e.g., Frank H. Sloss, M.C. Sloss and the California Supreme Court, 46 CAL. L. REV. 715, 728 (1958); Leonard G. Ratner, Congressional Power over the Appellate Jurisdiction of the Supreme Court, 109 U. PA. L.REV. 157, 188 (1960-61) (same). In Davis-Smith, the court noted the importance of liberty interests, including economic rights to pursue an occupation:
"The liberty mentioned in that [due process] amendment means not only the right of the citizen to be free from the mere physical restraint of his person, as by incarceration, but the term is deemed to embrace the right of the citizen to be free in the enjoyment of all his faculties; to be free to use them in all lawful ways; to live and work where he will; to earn his livelihood by any lawful calling; to pursue any livelihood or avocation, and for that purpose to enter into all contracts which may be proper, necessary and essential to his carrying out to a successful conclusion the purposes above mentioned."
Davis-Smith, 65 Wash. at 192, 117 P. 1101 (quoting Allgeyer v. Louisiana, 165 U.S. 578, 589, 17 S.Ct. 427, 41 L.Ed. 832 (1897)). However, this court explained, the liberty interest is not unfettered nor is the court's role a searching role to trump the legislature's actions as the dissent claims; rather, the elected legislature has meaningful authority:
[T]he legislature exercises a supervision over matters affecting the common weal and enforces the observance by each individual member of society of duties which he owes to others and the community at large. The possession and enjoyment of all rights are subject to this power. Under it, the state may "prescribe regulations promoting the health, peace, morals, education and good order of the people, and to legislate so as to increase the industries in the state, develop its resources, and add to its welfare and prosperity." ... The [due process] clause of the constitution now under consideration was intended to prevent the arbitrary exercise of power, or undue, unjust, and capricious interference with personal rights; not to prevent those reasonable regulations that all must submit to as a condition of remaining a member of society. In other words, the test of a police regulation, when measured by this clause of the constitution, is reasonableness, *582 as contradistinguished from arbitrary or capricious action.

Davis-Smith, 65 Wash. at 177-78, 117 P. 1101 (emphasis added). See also Parrish, 185 Wash. 581, 55 P.2d 1083; Aetna, 83 Wash.2d at 531-34, 520 P.2d 162 (discussing history of due process jurisprudence and rejecting appellant's invitation to void insurance statute on substantive due process ground because such a course of judicial intrusion had been "traveled and finally rejected by the United States Supreme Court," upholding statute under rational basis review).
¶ 39 Finally, we reject the dissent's claim that it is, after all, only advocating for the individual's right to "earn a living." A return to the Lochner era would, instead, strip individuals of the many rights and protections that have been achieved through the political process.
¶ 40 We conclude that there is a rational relationship between professional and occupational license suspension and the State's interest in enforcing child support orders.

CONCLUSION
¶ 41 Consistent with procedural due process, we hold that Amunrud was given a meaningful opportunity to be heard prior to and postsuspension of his commercial driver's license for failure to pay child support for his son. Further, consistent with long-standing law, we apply a rational basis test and hold that the enforcement of child support obligations is a legitimate state interest and RCW 74.20A.320 is rationally related to that interest.
Concurring: ALEXANDER, C.J., C. JOHNSON, BRIDGE, OWENS, FAIRHURST, JJ.
SANDERS, J. (dissenting).
¶ 42 We do not license drivers to assure they are current in child support payments; we license them to promote highway safety. By the same token, revocation of a driver's license for a reason completely unrelated to the only legitimate police power justification for the license in the first place violates due process.
¶ 43 We have long relied on the three prong due process test articulated in Lawton v. Steele.[1] For a law or regulation to satisfy due process it must (1) be aimed at achieving a legitimate public purpose, (2) use means that are reasonably necessary to achieve that purpose, and (3) not be unduly oppressive on individuals. Tiffany Family Trust Corp. v. City of Kent, 155 Wash.2d 225, 252, 119 P.3d 325 (2005); ASARCO Inc. v. Dep't of Ecology, 145 Wash.2d 750, 762, 43 P.3d 471 (2002); Sintra, Inc. v. City of Seattle, 119 Wash.2d 1, 21, 829 P.2d 765 (1992); Robinson v. City of Seattle, 119 Wash.2d 34, 830 P.2d 318 (1992); Presbytery of Seattle v. King County, 114 Wash.2d 320, 330, 787 P.2d 907 (1990); Orion Corp. v. State, 109 Wash.2d 621, 646-47, 747 P.2d 1062 (1987). The problem here is that there is not only no "reasonably necessary" relationship between road safety and revoking a driver's license to pay child support, there is no rational relationship at all. In other words, the legitimate end of licensing drivers to promote highway safety does not justify the means of revoking a driver's license to deter delinquency in child support.
¶ 44 Many cases illustrate the necessity of connecting the ground for revocation with the purpose of the license. Otherwise the State could simply license every human endeavor (shoeshine boys?) simply to deter anyone from undesirable conduct of any nature through the threat of license revocation.
¶ 45 For Greg Amunrud the sting of this statute is doubled since it involves not only a license to drive but a license to drive a taxi to earn a living. I question the logic of state revocation of a license to earn a living for failure to pay a debtalthough I suppose there is a certain incentive to do so if the *583 federal government will give a monetary grant to the State in return.[2] But it is up to us to protect the constitutional rights of our citizens, we should not be concerned that the legislature will lose its federal bribe money  certainly I'm not.

I. Liberty and Property Interest to be Protected
¶ 46 Government may not deprive one of life, liberty, or property without due process of law as guaranteed by the fourteenth amendment to the United States Constitution[3] and article I, section 3 of the Washington State Constitution.[4] The right to employment without undue government interference and the right to a driver's license implicate both liberty and property.
¶ 47 The right to pursue a common occupation free from unreasonable governmental interference is of ancient origin. William Blackstone recognized, "At common law every man might use what trade he pleased." 1 WILLIAM BLACKSTONE, COMMENTARIES *427. The Magna Carta guaranteed "all merchants are to be safe and secure in leaving and entering England, and in staying and traveling [sic] in England ... to buy and sell free from all maletotes by the ancient and rightful customs." JAMES CLARKE HOLT, MAGNA CARTA 461-63 (2d ed.1992). In Rex and Allen v. Tooley, 80 Eng. Rep. 1055 (K.B.1614), Lord Edward Coke, Chief Justice of the King's Bench, considered and dismissed a suit against an upholsterer for failure to serve an apprenticeship before taking up his trade, holding, "[N]o skill there is in this, for he may well learn this in seven hours." Id. at 1057. Thus unskilled labor was not subject to licensing perhaps appropriate to more technical trades. Expounding further,
[B]y the very common law, it was lawful for any man to use any trade thereby to maintain himself and his family; this was both lawful, and also very commendable, but yet by the common law, if a man will take upon him to use any trade, in which he hath no skill; the law provides a punishment for such offenders, and such persons were to be punished in the court leet, and by actions brought, as by the cases before ....
Id. at 1055. Thus Allen is an early example of the judicial recognition of the fundamental right to pursue an occupation, free from unreasonable governmental interference in the licensing context. Many other examples are marshaled in Timothy Sandefur, The Right to Earn a Living, 6 CHAP. L. REV. 207, 209-18 (2003). The English common law was the origin of the constitutional right as we know it in America.[5]
¶ 48 For substantive due process purposes the United States Supreme Court has likewise recognized "the right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity" that the Constitution was meant to protect. Truax v. Raich, 239 U.S. 33, 41, 36 S.Ct. 7, 60 L.Ed. 131 (1915).[6] Perhaps Justice William O. Douglas said it with the greatest eloquence:

*584 The right to work, I had assumed, was the most precious liberty that man possesses. Man has indeed as much right to work as he has to live, to be free, to own property. The American ideal was stated by Emerson in his essay on Politics, "a man has a right to be employed, to be trusted, to be loved, to be revered." It does many men little good to stay alive and free and propertied, if they cannot work. To work means to eat. It also means to live. For many it would be better to work in jail, than to sit idle on the curb. The great values of freedom are in the opportunities afforded man to press to new horizons, to pit his strength against the forces of nature, to match skills with his fellow man.
Barsky v. Bd. of Regents, 347 U.S. 442, 472, 74 S.Ct. 650, 98 L.Ed. 829 (1954) (Douglas, J., dissenting).
¶ 49 The right to pursue an occupation free from unreasonable governmental interference is fundamental. Supreme Court of N.H. v. Piper, 470 U.S. 274, 280 n. 9, 285, 105 S.Ct. 1272, 84 L.Ed.2d 205 (1985) (quoting United Bldg. & Constr. Trades Council v. City of Camden, 465 U.S. 208, 219, 104 S.Ct. 1020, 79 L.Ed.2d 249 (1984) in which the court has described, "the pursuit of a common calling" as "one of the most fundamental of those privileges" (emphasis added)). Washington also recognizes the "fundamental right[]" to "carry on business." State v. Vance, 29 Wash. 435, 458, 70 P. 34 (1902); Grant County Fire Prot. Dist. No. 5 v. City of Moses Lake, 150 Wash.2d 791, 813, 83 P.3d 419 (2004) (Grant County II).
¶ 50 Duranceau v. City of Tacoma, 27 Wash.App. 777, 620 P.2d 533 (1980) applied the right in practice. There the city of Tacoma, attempting to discourage anyone from living in the watershed town of Lester, published a policy to deny use of a forest service road to logging operators who employed Lester residents. Ronald D. Duranceau, a Lester resident and logging company employee, commenced suit pursuant to 42 U.S.C. § 1983, alleging violation of "his fundamental right to employment." Duranceau, 27 Wash. App. at 780, 620 P.2d 533. The Court of Appeals agreed, reversing a previous summary judgment of dismissal, holding, "[t]he right to hold specific private employment free from unreasonable government interference," is a fundamental right subject to "`strict scrutiny.'" Id.
¶ 51 Ample precedent supports Amunrud's claim that he has not only a constitutional right but a fundamental one to pursue a common occupation free from unreasonable *585 government interference. Professional and motor vehicle licenses create both property and liberty interests requiring due process protection. Barry v. Barchi, 443 U.S. 55, 99 S.Ct. 2642, 61 L.Ed.2d 365 (1979); Bell v. Burson, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971).

II. Standard of Review
¶ 52 To evaluate whether a statute violates due process, we first consider the nature of the right affected. If the statute limits a fundamental, constitutionally secured right or implicates a suspect class, the standard of review is strict scrutiny. In re Parentage of C.A.M.A., 154 Wash.2d 52, 57-58, 109 P.3d 405 (2005). Strict scrutiny is satisfied only if the State can show that it has a compelling interest, id., and the regulation is narrowly tailored to serve that compelling state interest. Washington v. Glucksberg, 521 U.S. 702, 721, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997). Authorities cited infra hold the right to pursue a common occupation absent unreasonable government interference is indeed a "fundamental" right subject to strict scrutiny. However even if that were not the case, due process requires at least a "rational relation" between licensing for driving and revocation for failure to pay child support.[7]

III. Application of the Three Prong, Lawton v. Steele, Substantive Due Process Test

A. The License Must Be Aimed at Achieving a Legitimate Public Purpose
¶ 53 The only reason to require driver's licenses in general, and commercial driver's licenses in particular, is "to make the highways as safe as possible by requiring each potential operator to demonstrate a knowledge of rules and regulations of the road, a history of compliance with those rules and regulations, and the physical ability to safely operate a motor vehicle." State v. Clifford, 57 Wash.App. 127, 132, 787 P.2d 571 (1990).
¶ 54 Similarly, Washington's Uniform Commercial Driver's License Act, chapter 46.25 RCW, states the purpose of the chapter is to "reduce or prevent commercial motor vehicle accidents, fatalities, and injuries by ... [d]isqualifying commercial drivers who have committed certain serious traffic violations, or other specified offenses." RCW 46.25.005(1)(b). See Merseal v. Dep't of Licensing, 99 Wash.App. 414, 418-19, 994 P.2d 262 (2000) (holding the Uniform Commercial Driver's License Act is liberally construed to protect the public from alcohol impaired drivers of commercial vehicles and that public safety is a sufficient basis for distinguishing between commercial drivers and the general public).
¶ 55 Just as initially granting or withholding a driver's license must at least be rationally related to promoting the safety of the streets and highways, revocation of that license must similarly be necessary to achieve that goal. State v. Hopkins, 109 Wash.App. 558, 564, 36 P.3d 1080 (2001) ("A long line of Washington cases holds that revocation of a driver's license is ... designed solely for the protection of the public in the use of highways."). Moreover, licenses are remedial (i.e., protecting highway safety), not punitive. State v. McClendon, 131 Wash.2d 853, 868, 935 P.2d 1334 (1997); State v. Griffin, 126 Wash.App. 700, 705, 109 P.3d 870, 873 (2005) ("[T]he general rule in Washington has long been `the suspension or revocation of a driver's license is not penal in nature and is not intended as punishment, but is designed solely for the protection of the public in the use of the highways.").
¶ 56 Before enactment of the statute at issue, the governing statutory authority to suspend driver's licenses set forth six grounds for license revocation. These were all related to the traffic safety:
(1) Has committed an offense for which mandatory revocation or suspension of license is provided by law;
(2) Has, by reckless or unlawful operation of a motor vehicle, caused or contributed to an accident resulting in death or injury to any person or serious property damage;

*586 (3) Has been convicted of offenses against traffic regulations governing the movement of vehicles, or found to have committed traffic infractions, with such frequency as to indicate a disrespect for traffic laws or a disregard for the safety of other persons on the highways;

(4) Is incompetent to drive a motor vehicle under RCW 46.20.031(3); or
(5) Has failed to respond to a notice of traffic infraction, failed to appear at a requested hearing, violated a written promise to appear in court, or has failed to comply with the terms of a notice of traffic infraction or citation ...; or
(6) Has committed one of the prohibited practices relating to drivers' licenses defined in RCW 46.20.336.
Former RCW 46.20.291 (1993) (emphasis added).
¶ 57 However the challenged amendment to RCW 46.20.291 added a seventh ground, unrelated to traffic safety:
(7) Has been certified by the department of social and health services as a person who is not in compliance with a child support order or a residential or visitation order as provided in RCW 74.20A.320.
Former RCW 46.20.291 (1997).[8]

B. Are the Means Necessary to Achieve the Legitimate Purpose?
¶ 58 To determine whether the means are necessary to achieve the end, we must look to the purpose and lawful justification of requiring driver's licenses in the first place, i.e., the license requirement must be justified by a legitimate exercise of the police power. Any attempt to revoke the license must similarly be tied to that same legitimate exercise of the police power.
¶ 59 The police power is a power reserved by the states to protect the health and safety of its citizens. Butchers' Union Slaughter-House & Live-Stock Landing Co. v. Crescent City Live-Stock Landing & Slaughter-House Co., 111 U.S. 746, 754-55, 4 S.Ct. 652, 28 L.Ed. 585 (1884). Wash. Const. art. I, § 1 ("All political power is inherent in the people, and governments derive their just powers from the consent of the governed, and are established to protect and maintain individual rights.").
¶ 60 States may require a variety of licenses to protect health, safety, and welfare. For example, medical licenses are required to protect the public to ensure that doctors have achieved the requisite training prior to practicing medicine.[9] Similarly, states require licenses for those engaging in the business of cosmetology, barbering, manicuring, and aesthetics because they "involve the use of tools and chemicals which may be dangerous when mixed or applied improperly...."[10]
¶ 61 However, the power to regulate by granting or revoking licenses is not unlimited. To legitimately exercise the police power, the means of the regulation must have a real and substantial relation to the legitimate reason for licensing the activity. See Chi., B. & Q. Ry. v. Illinois, 200 U.S. 561, 593, 26 S.Ct. 341, 350, 50 L.Ed. 596 (1906) ("If the means employed have no real, substantial relation to public objects which government may legally accomplish; if they are arbitrary and unreasonable, beyond the necessities of the case, the judiciary will disregard mere forms and interfere for the protection of *587 rights injuriously affected by such illegal action.").
¶ 62 Cornwell is instructive. Cornwell v. Cal. Bd. of Barbering & Cosmetology, 962 F.Supp. 1260, 1263 (S.D.Cal.1997). There an African hair braiding association brought suit against California state agencies and officials arguing the licensing requirements of the Barbering and Cosmetology Act (Cal. Bus. & Prof.Code § 7301), as applied to the hair braiders, violated due process because hair braiders were required to attend 1,600 hours of instruction at cosmetology school at a cost of between $5,000 and $7,000 where hair braiding was not even mentioned. Id. (citing Cal.Code Reg. § 950.2).
¶ 63 Because cosmetology schools did not teach African hair styling techniques as part of the required curriculum and did not include instruction in African hair styling, natural hair care, braiding, twisting, weaving, locking, or cornrowing, the court found that "[n]inety-six percent of the curriculum would be irrelevant to the occupation for which they would be seeking licensure." Id. at 1273.
¶ 64 The court held the license requirement violated due process, observing, "if [we] were to assume that these 65 hours [of instruction in health and safety] are rationally related to the state's interest in protecting the health and safety of its citizens, this education is one small part of a curriculum which plaintiff contends is 96% useless to [hair braiders]." Id. The court noted the irrationality of the license requirement:
To take an extreme example, the state could rationally believe that food preparers need instruction on hygiene, sanitation and disinfection prior to being allowed to prepare food in public schools. It would be irrational however, to require them to go to cosmetology school, even though they might benefit from the 65 hours related to health, hygiene and sanitation. Ninety-six percent of the curriculum would be irrelevant to the occupation for which they would be seeking licensure.
Id.
¶ 65 In sum, the police power to revoke licenses must be rationally related to the goal or purpose of requiring the particular license in the first place. We do not revoke pet licenses for traffic infractions, nor do we deny driver's licenses to those who fail to license their pets (or pay their child support).
¶ 66 People v. Lindner, 127 Ill.2d 174, 180, 535 N.E.2d 829, 129 Ill.Dec. 64 (1989) applied this principle to driver's licenses. There the Illinois Supreme Court struck down a section of the Illinois Vehicle Code which required mandatory driver's license suspension of defendants convicted of various felonies, including sex and drug offenses. Applying the rational relationship test the court concluded that the means chosen by the Illinois legislaturelicense suspensionwas not a reasonable method to accomplish the goal of the licensing statutethe safe and legal operation and ownership of motor vehicles:
Under the rational-basis test, a "`legislative enactment must bear a reasonable relationship to the public interest intended to be protected, and the means adopted must be a reasonable method of accomplishing the desired objective.'"
Id. (quoting People v. Wick, 107 Ill.2d 62, 65-66, 89 Ill.Dec. 833, 481 N.E.2d 676 (1985) (internal quotation marks omitted)). Accord State v. Gowdy, 64 Ohio Misc.2d 38, 40, 639 N.E.2d 878 (1994) (relying on Lindner, 127 Ill.2d 174, 129 Ill.Dec. 64, 535 N.E.2d 829, holding the statutory provision mandating license suspension for drug offenses does not bear a reasonable relationship to the statute's purpose of providing for the safe and legal operation and ownership of motor vehicles).
¶ 67 Professional license revocation also requires a rational relationship between the revocation of the license and the applicant's fitness or capacity to conduct that particular profession. For example, in Schware v. Board of Bar Examiners, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957) the board of bar examiners refused to permit the petitioner to take the bar examination on the ground that he had not shown "good moral character" because of his previous membership in the Communist Party. The Supreme Court held: "A State can require high standards of qualification, such as good moral character or proficiency in its law, before it admits an applicant to the bar, but any qualification *588 must have a rational connection with the applicant's fitness or capacity to practice law." Id. at 239, 77 S.Ct. 752. See also In re Revocation of License to Practice Dentistry of Flynn, 52 Wash.2d 589, 594, 328 P.2d 150 (1958) (holding that there must be a rational connection between the acts giving rise to the license revocation and Flynn's fitness and capacity to practice dentistry to constitute a valid reason for the revocation).
¶ 68 Justice Madsen once forcefully and articulately argued driver's license revocations must be rationally related to a driving offense to satisfy due process. State v. Shawn P., 122 Wash.2d 553, 569, 859 P.2d 1220 (1993) (Madsen, J., dissenting).[11] In Shawn P. the majority upheld the validity of a statute that revoked or denied driver's licenses to minors of a certain age who had been found guilty of possessing or consuming alcohol, regardless of whether the minor drove while possessing or after consuming. See RCW 66.44.365; RCW 13.40.265. Both the majority and the dissent recognized the same approachthat the license revocation must have a necessary relationship to driving. The majority upheld the statute, relying on legislative findings supported by "`voluminous statistical data' demonstrating that a disproportionate number of juveniles drive while impaired and that they thus pose a serious risk to the safety of themselves and others." Shawn P., 122 Wash.2d at 562 & n. 33, 859 P.2d 1220 (quoting Michael S. Vaughn, Victor E. Kappeler & Rolando V. del Carmen, A Legislative and Constitutional Examination of "Abuse and Lose" Juvenile Driving Statutes, 19 AM. J. CRIM. L. 411, 427 (1992)).
¶ 69 In dissent Justice Madsen applied a due process analysis, reasoning the statute lacked the constitutionally required link to traffic safety:
This legislation, even if it had not been restricted to a particular age group, would still suffer from a fundamental flaw: there is no rational basis for revoking driver's licenses based on nondriving offenses. The possession or consumption of liquor in no way requires the operation of motor vehicle; therefore, a finding that a person possessed, or even drank from, a can of beer hardly establishes that the person is a threat as a drunk driver.
Shawn P., 122 Wash.2d at 572, 859 P.2d 1220 (Madsen, J., dissenting). To survive a due process challenge, Justice Madsen stated that there must be an "immediate connection" with operating a motor vehicle and license revocation. Id. Even the "mere fact that drinking is associated with driving in the abstract will not suffice to supply the requisite rationality." Id. (quoting Johnson v. State Hearing Exam'r Office, 838 P.2d 158, 174 (Wyo.1992) (quoting Commonwealth v. Strunk, 400 Pa.Super. 25, 41, 582 A.2d 1326, 1334 (1990) (Popovich, J., dissenting))). Concluding, Justice Madsen opined where there is no "immediate connection with operating a motor vehicle, the license revocation is arbitrary and lacks the rational relationship demanded by substantive due process." Id.
¶ 70 Revocation of a driver's license for failure to pay child support provides even less rational relationship to driving than a minor found guilty of possessing or consuming alcohol. At least in Shawn P. there was a feasible argument that a minor who consumes alcohol illegally on one occasion might in the future also drive while under the influence. By contrast, a failure to make child support payments does not even have a potential future association with unsafe driving.
¶ 71 We have required such a rational relationship for other statutes as well. In State v. Riley, 121 Wash.2d 22, 36-38, 846 P.2d 1365 (1993), we explained the underlying purpose of the necessity of a rational relationship between the conditions imposed in a criminal sentence and the underlying crime:
The philosophy underlying the "crime-related" provision is that "[p]ersons may be punished for their crimes and they may be prohibited from doing things which are directly related to their crimes, but they *589 may not be coerced into doing things which are believed will rehabilitate them."
Riley, 121 Wash.2d at 36-37, 846 P.2d 1365 (quoting DAVID BOERNER, SENTENCING IN WASHINGTON § 4.5, at 4-7 (1985)).
¶ 72 Similarly, in the context of restitution we have held:
Restitution must be reasonably related either to a defendant's duty to make reparation or to the prevention of future crimes. State v. Morgan, 8 Wash.App. 189, 190, 504 P.2d 1195 (1973); State v. Summers, 60 Wash.2d 702, 375 P.2d 143 (1962). If a restitution order is expected to direct a defendant to accept responsibility for a crime, the order must be reasonably related to that crime. As noted in State v. Stalheim, 275 Or. 683, 688, 552 P.2d 829, 831 (1976): "when a defendant is ordered to make reparation to persons other than the direct victim of a crime, the rehabilitative effect of making the offender clearly appreciate the injury caused by his offense would, in our opinion, be significantly diluted."
State v. Eilts, 94 Wash.2d 489, 493-94, 617 P.2d 993 (1980).
¶ 73 The only conceivable purpose to revoke one's driver's license for failure to make child support payments is deterrence by threatened punishment.[12] The problem with this approach was well summarized in Strunk, as stated in Shawn P:
The test of "rational relationship" as defined by the "deterrence" rationale is not logically cabined solely to the offense of underage drinking or offenses committed by minors. Consider a legislature desirous of deterring juvenile vandalism. Under today's rationale, and owing to the intractable nature of juvenile deterrence, the legislature might rationally consider suspension of operator's privileges as an effective deterrent. Following like reasoning, the legislature might penalize public drunkenness or disorderly conduct or loitering with suspension of operator's privileges. To be sure, these are but a few examples. Troublesome with the "deterrence" rationale is that its limits are largely defined by the ingenuity of legislators, not by the test of rationale [sic] relationship under the substantive component to the Due Process Clause.
Shawn P., 122 Wash.2d at 573, 859 P.2d 1220 (Madsen, J., dissenting) (quoting Strunk, 400 Pa.Super. at 43 n. 3, 582 A.2d 1326 (Popovich, J., dissenting)).
¶ 74 Amunrud was deprived that process due when the State revoked his driver's license for failing to pay an obligation unrelated to his driving.

C. The Statute is Unduly Oppressive
¶ 75 The third prong of the substantive due process test requires an analysis of whether the statute is "unduly oppressive." Presbytery of Seattle, 114 Wash.2d at 331, 787 P.2d 907. Several factors are considered to assist the determination whether a regulation is unduly burdensome: "the nature of the harm sought to be avoided; the availability and effectiveness of less drastic protective measures; and the economic loss suffered by the property owner." Id.

1. Nature of harm sought to be avoided
¶ 76 The statute at issue deprives anyone six months arrears in child support his or her driver's license or commercial driver's license regardless of occupation.
¶ 77 As applied to Amunrud, the statute not only unreasonably interferes with the property interest in his commercial driver's license but also his fundamental right to pursue a common occupation. The United States Supreme Court in Bell, 402 U.S. at 539, 91 S.Ct. 1586 said, "Once licenses are issued, as in petitioner's case, their continued possession may become essential in the pursuit of a livelihood."

2. Availability of less drastic measures
¶ 78 The majority argues license revocation is a highly effective enforcement tool. *590 Extortion normally is. However, historic methods of collecting child support remain as a less intrusive and more effective way to accomplish the goal of the statute than taking away the debtor's source of income. These means include but are not limited to garnishment,[13] civil liability,[14] execution,[15] property liens,[16] contempt of court, and federal prosecution under the Child Support Recovery Act of 1992 and Deadbeat Parents Punishment Act of 1998, 18 U.S.C. § 228. These means reach the objective directly without the oppressive revocation of an unrelated license.

3. Economic loss suffered
¶ 79 Taking away Amunrud's commercial driver's license denies him the ability to pursue his occupation as a taxi cab driver. Denying him the ability to continue to work the only occupation he has worked for over 20 years will place an undue and oppressive burden on his ability to earn a living  and will, ironically, terminate his ability to make future child support payments.
¶ 80 In sum, the statute deprives Amunrud his liberty and property absent that process due under the state and federal constitutions.

CONCLUSION
¶ 81 I would reverse, and dissent.
Dissenting: J.M. JOHNSON, CHAMBERS, JJ.
NOTES
[1] In addition to his constitutional arguments, Amunrud maintained (1) that the order of child support was void because the court raised his child support payments rather than lowering them, (2) that he should have been provided an attorney by the state, (3) that he was not obligated to pay child support because the child's mother had refused him visitation, and (4) that he was not advised of the appeal deadline of the March 2002 child support order. These issues were not raised in the petition for review in this court.
[2] Amunrud also generally claims a violation of his due process under the Washington Constitution. However, Amunrud does not provide argument on this issue apart from his challenges to RCW 74.20A.320 under the fourteenth amendment to the United States Constitution. Because we have found that the Washington Constitution provides equal, but not greater, due process protection, In re Personal Restraint of Dyer, 143 Wash.2d 384, 394, 20 P.3d 907 (2001), Amunrud's due process challenges will be analyzed under the Fourteenth Amendment.
[3] Amunrud does not claim he has a fundamental right to a driver's license. See, e.g., State v. Shawn P., 122 Wash.2d 553, 560-61, 859 P.2d 1220 (1993) (statutes governing driver's licenses involve a protected interest but do not involve a fundamental right).
[4] In his petition for review, Amunrud also states that strict scrutiny should be applied here because there is a suspect classification involved. Pet. of Greg Amunrud for Review at 5. While this argument implicates a question of equal protection, beyond this mere mention, Amunrud does not pursue this argument further in his petition for review. Pursuant to RAP 13.7(b), we decline to address this argument.
[5] As this court discussed in Weden v. San Juan County, 135 Wash.2d 678, 958 P.2d 273 (1998), this additional requirement has limited applicability even in land use cases. The purpose of this test "is to prevent excessive police power regulations that would require an individual to `shoulder an economic burden, which in justice and fairness the public should rightfully bear.'" Id. at 706, 958 P.2d 273 (quoting and citing, inter alia, Orion Corp. v. State, 109 Wash.2d 621, 648-49, 747 P.2d 1062 (1987) (land use case)). In Weden, this court found that the test did not apply because unlike developers in land use cases, the machine owners in that case were "directly responsible for the problems created by the use of their machines," explaining that "[i]t defies logic to suggest an ordinance is unduly oppressive when it regulates only the activity which is directly responsible for the harm." Id. (finding no substantive due process violation in ordinance that limited motorized personal watercraft). See also Hugh D. Spitzer, Municipal Police Power in Washington State, 75 WASH. L.REV. 495 (2000) (explaining how the "oppressive" test has been used in substantive due process land use cases in this state and discussing its departure from federal jurisprudence, which generally applies the rational basis test discussed above).
[6] Lochner was overruled by West Coast Hotel Co. v. Parrish, 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703 (1937). See also Day-Brite Lighting, Inc. v. Missouri, 342 U.S. 421, 72 S.Ct. 405, 96 L.Ed. 469 (1952) (recognizing demise of Lochner line of cases).
[1] 152 U.S. 133, 14 S.Ct. 499, 38 L.Ed. 385 (1894). "The classic statement of the rule in Lawton v. Steele is still valid today." Goldblatt v. Hempstead, 369 U.S. 590, 594, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962) (citation omitted); cf. Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 125 S.Ct. 2074, 2087, 161 L.Ed.2d 876 (2005) (Due process requires an "exaction[] substantially advanced the same interests that land-use authorities asserted would allow them to deny the permit altogether.").
[2] The majority notes that while states are not required to participate in the Child Support Enforcement Program, those states without procedures to "'withhold or suspend, or to restrict the use of driver's licenses, professional and occupational licenses, and recreational and sporting licenses of individuals owing overdue support"' are not eligible to receive federal grants or moneys. Majority at 572-73 (quoting 42 U.S.C. § 666(a)(16)).
[3] "[N]or shall any state deprive any person of life, liberty, or property, without due process of law ...." U.S. Const. amend. XIV, § 1.
[4] "No person shall be deprived of life, liberty, or property, without due process of law." Wash. Const. art. I, § 3.
[5] Slaughter-House Cases, 83 U.S. (16 Wall.) 36, 105, 21 L.Ed. 394 (1872) ("And when the Colonies separated from the mother country no privilege was more fully recognized or more completely incorporated into the fundamental law of the country than that every free subject of the British empire was entitled to pursue his happiness by following any of the known established trades and occupations of the country ...." (Field, J., dissenting)).
[6] See also Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923) (The liberty interest guaranteed includes freedom "to engage in any of the common occupations of life ...."); Dent v. West Virginia, 129 U.S. 114, 121, 9 S.Ct. 231, 32 L.Ed. 623 (1889) ("It is undoubtedly the right of every citizen of the United States to follow any lawful calling, business, or profession he may choose, subject only to such restrictions as are imposed upon all persons of like age, sex and condition."); New State Ice Co. v. Liebmann, 285 U.S. 262, 278, 52 S.Ct. 371, 76 L.Ed. 747 (1932) ("[N]othing is more clearly settled than that it is beyond the power of a state, `under the guise of protecting the public, arbitrarily [to] interfere with private business or prohibit lawful occupations or impose unreasonable and unnecessary restrictions upon them.'" (alteration in original) (quoting Jay Burns Baking Co. v. Bryan, 264 U.S. 504, 513, 44 S.Ct. 412, 68 L.Ed. 813 (1924))); Schware v. Bd. of Bar Exam'rs, 353 U.S. 232, 238-39, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957) ("[A] State cannot exclude a person from the practice of law or from any other occupation in a manner or for reasons that contravene the Due Process or Equal Protection Clause of the Fourteenth Amendment."); Bd. of Regents v. Roth, 408 U.S. 564, 572, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) (recognizing the right "`to engage in any of the common occupations of life'") (quoting Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923)); Lowe v. Secs. Exch. Comm'n, 472 U.S. 181, 228, 105 S.Ct. 2557, 86 L.Ed.2d 130 (1985) (quoting Dent and Schware, supra, for the proposition that citizens have a right to follow any lawful calling subject to licensing requirements that are rationally related to their fitness or capacity to practice the profession); Greene v. McElroy, 360 U.S. 474, 492, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959) ("[R]ight to hold specific private employment and to follow a chosen profession free from unreasonable governmental interference comes within the `liberty' and `property' concepts of the Fifth Amendment"); Benigni v. City of Hemet, 879 F.2d 473, 478 (9th Cir.1988) (due process provides people a constitutional "right to pursue an occupation"); Chalmers v. City of Los Angeles, 762 F.2d 753, 757 (9th Cir.1985) ("Chalmers had a right protected by the due process clause to engage in [his] occupation."); Cornwell v. Cal. Bd. of Barbering & Cosmetology, 962 F.Supp. 1260, 1274 (S.D.Cal.1997) ("`The right to labor or earn one's livelihood in any legitimate field of industry or business is a right of property, and any unlawful or unreasonable interference with, or abridgement of, such right is an invasion thereof and a restriction of the liberty of the citizen as guaranteed by the Constitution."' (quoting Whitcomb v. Emerson, 46 Cal.App.2d 263, 273, 115 P.2d 892 (1941))).
[7] See Clark Neily, No Such Thing: Litigating Under the Rational Basis Test, 1 N.Y.U.J.L. & LIBERTY 898 (2005) (a critical and searching review of the rational basis test).
[8] In 1998 the legislature revised RCW 46.20.291, causing subsection (7) to be renumbered to subsection (8). Laws of 1998, ch. 165, § 12.
[9] RCW 18.71.050 establishes eligibility requirements for a license to practice medicine, which include proof the applicant has attended and graduated from an approved school of medicine and completed two years of postgraduate medical training, is of good moral character, and is physically and mentally capable of safely carrying on the practice of medicine. RCW 18.71.070 provides applicants must also successfully complete an examination covering subjects and topics, knowledge of which is generally required of a candidate for a degree of doctor of medicine. See also Ongom v. Dep't of Health, 124 Wash. App. 935, 943, 104 P.3d 29 (holding "purpose of the medical license ... is to assure professional competence in a highly complex and potentially dangerous occupation"), review granted, 155 Wash.2d 1001, 122 P.3d 185 (2005).
[10] RCW 18.16.010, .060; Cornwell, 962 F.Supp. at 1274.
[11] Justice Madsen cites the majority opinion in Shawn P. for the rule that the rational basis test is the most relaxed form of judicial scrutiny. Majority at 578-79. However, her opinion in the present case does not reconcile or distinguish the substantive conflict between the opinions offered here and both opinions in Shawn P.
[12] Compare Griffin, 126 Wash.App. at 705, 109 P.3d 870 ("`suspension or revocation of a driver's license is not penal in nature"' (quoting State v. Scheffel, 82 Wash.2d 872, 879, 514 P.2d 1052 (1973))).
[13] RCW 74.20A.080, .095.
[14] RCW 74.20A.100.
[15] RCW 6.17.020.
[16] RCW 74.20A.060, .130.