# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 46819-1-II |
| Respondent, | |
| v. | |
| LONZELL DEVAUGHN GRAHAM, | UNPUBLISHED OPINION |
| Appellant. | |

MELNICK, J. — Lonzell Devaughn Graham appeals from his conviction and sentence for a felony domestic violence court order violation. We conclude that the trial court did not err by denying Graham's motion to suppress, that the legal financial obligations (LFOs) ordered do not violate his due process or equal protection rights, that the trial court did not err by ordering Graham to provide a biological sample. We further conclude that the trial court did err by not conducting an individualized inquiry before imposing a discretionary LFO. We affirm, but remand to the trial court to conduct an individualized inquiry as to Graham's ability to pay the discretionary LFO.

## FACTS

On May 20, 2014, the State charged Graham with a felony domestic violence court order violation, alleging he willfully contacted Tasha Lamb, the protected party, after having received actual notice of the existence of the court order, and that he had at least two previous convictions for violating orders.

I.    SUPPRESSION HEARING

On August 26, 2014, Graham filed a motion to suppress evidence pursuant to CrR 3.6.  On September 3, the trial court heard the following undisputed testimony from Officer Donald Hobbs on the motion to suppress.  Hobbs worked as a police officer for approximately ten years.  He came into contact with Graham on Pacific Highway in Milton while working patrol.  As he monitored traffic, Hobbs observed a gold Lincoln automobile driving southbound with "two windshield wipers stuck on the windshield in an upright position . . . [and] both or one of the side front windows was very dark tinted."  1 Report of Proceedings (RP) at 57.  It was a dry day.  Hobbs stopped the vehicle because "obviously, the windshield wipers were defective.  They were stuck in an upright position, which would make them defective windshield wipers, and probably obscuring his view as well.  And dark tinted windows."  1 RP at 58.

Based on Hobbs's training and experience, he knew "what a dark tinted window looks like that's darker than allowed by law," and he "had [completed] numerous, numerous stops on tinted windows."  1 RP at 58.  He also has made "many, many" stops for equipment violations, such as windshield wipers stuck in the middle of the windshield.  1 RP at 58.  Officer Hobbs took a photo that showed the windshield wipers were stuck in the upright position.  He wrote Graham a ticket for the tint of the windows and for the broken windshield wipers.

On September 26, the trial court filed its findings of fact and conclusions of law regarding the motion to suppress.  In relevant part, the trial court found:

UNDISPUTED FACTS

1. On May 18, 2014, Milton Police Officer Donald Hobbs observed a vehicle traveling south bound at the 7800 block of Pacific Highway in Milton, WA.  He observed the vehicle's windshield wipers were stuck in an upright position and it was not raining.  Officer Hobbs observed the vehicle's windows were darker than allowed by law.  Based on his training and experience as a patrol officer for approximately ten years, Officer Hobbs pulled the vehicle over.

2

46819-1-II

. . . .

CONCLUSIONS OF LAW

. . . .

3. The court found Officer Hobbs' testimony credible.

4. Officer Hobbs had an articulable reasonable suspicion [to] conduct a traffic stop and was legally authorized to contact the defendant.

Clerk's Papers (CP) at 63-65.

II.    TRIAL AND SENTENCING

On September 3, the parties stipulated to the admission of Graham's prior convictions for violating protection orders issued under chapter 10.99 RCW or chapter 26.50 RCW.

Officer Hobbs, the sole witness at trial, testified similarly to how he did at the suppression hearing with the following additions. Graham drove the car and a woman sat in the passenger seat. Graham handed Officer Hobbs his registration and license, and Officer Hobbs radioed dispatch to check Graham's name. Dispatch advised Hobbs that Graham had a valid license, and that a no contact order existed prohibiting his contact with Lamb. Dispatch told Officer Hobbs that Lamb was a white female born in 1980. Officer Hobbs went to the passenger side of Graham's vehicle, advised the woman that a protection order existed, and requested her identification. Using the identification the passenger provided, Officer Hobbs confirmed the woman was Lamb. He returned to his car, and after dispatch confirmed the existence of a protection order, Hobbs placed Graham under arrest for violating the no contact order.

The jury found Graham guilty. By special verdict, the jury also found that Graham and Lamb were members of the same family or household.

On September 26, the trial court sentenced Graham to 60 months of confinement. In determining Graham's LFOs the following exchange occurred:

3

[THE STATE]: Thank you. And I would note it's mandatory legal financial obligations, $500 crime victim assessment, the $100 DNA[1] database fee, the $500 DAC[2] recoupment.

THE COURT: DAC recoupment is not mandatory.

[THE STATE]: I believe she was a conflict through DAC.

[DEFENSE]: Yes.

[THE STATE]: And the $200 filing fee. I just wanted to accurately—

THE COURT: What the court's intent is is that it be the minimum we can impose and still be consistent with the statute. It makes no sense to burden him further with financial obligations. He walks out of here and he has another problem. Enough already.

[THE STATE]: I understand.

[DEFENSE]: Your Honor, Mr. Graham and I were just discussing that some of the costs are mandatory and some are discretionary. And one that he had a question about was the DNA fee, because based on his history, as the court—

THE COURT: Maybe had one or two before?

[DEFENSE]: Yes.

THE COURT: I know. It's mandatory. Whether it makes sense or not, again, that's up to the Legislature. The point is well taken.

[GRAHAM]: I've been—I was sentenced another time where everything was waived because I was on Social Security, and they knew they [weren't] going to get the money anyways.

THE COURT: Well, there's a difference in enforcing and putting it in the rule. And the time of enforcement I think is when you take up the issue of whether or not they're actually going to impose it on you or enforce it at that point. It's not this point. This is the time the amount is set forth. But the actual enforcement is the time to take up the issue of whether or not you can afford is at that time.

[THE STATE]: . . . Would you be putting him on a $10-per-month payment plan upon release from prison?

THE COURT: I don't think I can do that without knowing his financial condition. And I won't know that until he's released, so I won't be doing that.

[THE STATE]: Thank you.

THE COURT: I could put in not more than $10.

[GRAHAM]: I'm on Social Security.

5 RP at 348-50. Graham did not object to the DAC recoupment fee at the hearing, but he did object to the DNA fee. The trial court ordered Graham to pay $1,300 in LFOs, all of which were mandatory, except for the DAC recoupment fee. Graham appeals.

---

[1] Deoxyribonucleic acid.

[2] Department of Assigned Counsel.

4

ANALYSIS

I.    MOTION TO SUPPRESS

Graham argues that because Hobbs did not have a reasonable articulable suspicion a traffic infraction was occurring, the trial court erred by denying his motion to suppress evidence. Graham specifically challenges the trial court's finding of fact 1 that the stop was based on the officer's training and experience and conclusion of law 4. We disagree.

A.    Standard of Review

We review a trial court's denial of a motion to suppress by determining whether substantial evidence supports the challenged findings of fact and whether those findings support the trial court's conclusions of law. *State v. Ross*, 106 Wn. App. 876, 880, 26 P.3d 298 (2001). Evidence is substantial when it is enough "to persuade a fair-minded person of the truth of the stated premise." *State v. Reid*, 98 Wn. App. 152, 156, 988 P.2d 1038 (1999). Unchallenged findings of fact are verities on appeal. *State v. Bonds*, 174 Wn. App. 553, 562, 299 P.3d 663 (2013). We review conclusions of law de novo. *State v. Roden*, 179 Wn.2d 893, 898, 321 P.3d 1183 (2014).

B.    The Trial Court Did Not Err By Denying the Motion to Suppress

Under the Fourth Amendment to the United States Constitution and article I, section 7 of the Washington State Constitution, a police officer generally cannot seize a person without a warrant supported by probable cause. *State v. Garvin*, 166 Wn.2d 242, 249, 207 P.3d 1266 (2009). "'As a general rule, warrantless searches and seizures are per se unreasonable.'" *State v. Hendrickson*, 129 Wn.2d 61, 70, 917 P.2d 563 (1996) (quoting *State v. Houser*, 95 Wn.2d 143, 149, 622 P.2d 1218 (1980)). However, "[e]xceptions to the warrant requirement fall into several broad categories: consent, exigent circumstances, searches incident to a valid arrest, inventory searches, plain view," and investigative stops as set forth in *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct.

1868, 20 L. Ed. 2d 889 (1968). *State v. Ladson*, 138 Wn.2d 343, 349, 979 P.2d 833 (1999). "The burden is always on the state to prove one of these narrow exceptions." *Ladson*, 138 Wn.2d at 350.

A *Terry* stop is justified when the officer can "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21. When considering the reasonableness of a stop, the court must evaluate it based on a totality of the circumstances. *State v. Glover*, 116 Wn.2d 509, 514, 806 P.2d 760 (1991). "The trial court takes into account an officer's training and experience when determining the reasonableness of a *Terry* stop." *Glover*, 116 Wn.2d at 514. *Terry* stops have been applied to traffic violations, including traffic infractions. *State v. Duncan*, 146 Wn.2d 166, 173-74, 43 P.3d 513 (2002); *Ladson*, 138 Wn.2d at 350-51. Those traffic stops are subject to the same reasonableness requirement. *Ladson*, 138 Wn.2d at 350.

Substantial evidence supports the trial court's finding of fact 1. Officer Hobbs, the sole witness at the suppression hearing, testified to each of the facts in the trial court's finding of fact 1. Officer Hobbs stated that based on his training and experience, he had completed "numerous stops on tinted windows and I know what a dark tinted window looks like that's darker than allowed by law." 1 RP at 58. Therefore, substantial evidence supported the trial court's finding.

Because substantial evidence supports the finding, we review the trial court's conclusion of law. Officer Hobbs had a reasonable articulable suspicion that Graham's windows were too darkly tinted, a traffic violation, and the trial court did not err by so concluding.

Therefore, the trial court correctly denied Graham's motion to suppress.

II.     LEGAL FINANCIAL OBLIGATIONS

Graham argues the mandatory DNA collection fee under RCW 43.43.7541[3] violates his substantive due process rights because he does not have the ability or the likely future ability to pay.  He also argues that RCW 43.43.7541 violates his right to equal protection because it requires some defendants to pay the DNA collection fee multiple times while others only pay it once.  Finally, Graham argues that the trial court erred when it ordered him to pay a "court-appointed attorney fee" because it mistakenly believed it was mandatory.  Br. of Appellant at 21.  We disagree with Graham's arguments, except that the trial court erred in imposing a discretionary LFO, i.e. the attorney fee, without first making an inquiry into his ability to pay.

A.     STANDING

The State argues that Graham lacks standing to challenge the constitutionality of the DNA fee as violating substantive due process because he "has not been found to be constitutionally indigent."  Br. of Resp't at 12.  We disagree.

We review whether a party has standing to assert a constitutional violation de novo.  *State v. A.W.*, 181 Wn. App. 400, 409, 326 P.3d 737 (2014).

> No precise definition of "constitutional indigence" exists.  In *Williams* [*v. Illinois*, 399 U.S. 235, 242, 90 S. Ct. 2018, 26 L. Ed. 2d 586 (1970)], the Supreme Court spoke of indigence as meaning "without funds."  Nonetheless, courts have recognized that constitutional indigence cannot mean absolute destitution.  At the same time, a constitutional distinction exists between poverty and indigence, and constitutional protection attaches only to indigence.  *Bearden* [*v. Georgia*, 461 U.S. 660, 661-62, 666 n.8, 103 S. Ct. 2064, 76 L. Ed. 2d 221 (1983),] essentially mandates that we examine the totality of the defendant's financial circumstances to determine whether he or she is constitutionally indigent in the face of a particular fine.

*State v. Johnson*, 179 Wn.2d 534, 553-54, 315 P.3d 1090 (2014) (citations omitted).

---

[3] The 2015 amendment to RCW 43.43.7541 does not affect our analysis in this opinion.  *See* LAWS OF 2015, Ch. 265, § 31.

To prove standing, Graham must show (1) "'a personal injury fairly traceable to the challenged conduct and likely to be redressed by the requested relief'" and (2) that his claim falls within the zone of interests protected by the statute or constitution provision at issue. *Johnson*, 179 Wn.2d at 552 (quoting *High Tide Seafoods v. State*, 106 Wn.2d 695, 702, 725 P.2d 411 (1986)). If a party lacks standing for a claim, we refrain from reaching the merits of the issue. *Johnson*, 179 Wn.2d at 552. A defendant may not challenge the constitutionality of a statute unless he or she is harmed by the alleged unconstitutional feature of the challenged statute. *State v. Jendrey*, 46 Wn. App. 379, 384, 730 P.2d 1374 (1986); *State v. Lundquist*, 60 Wn.2d 397, 401, 374 P.2d 246 (1962).

The trial court appointed Graham a lawyer, and at sentencing, the trial court learned that Graham was on social security. The trial court found him indigent. The trial court also made clear that because of Graham's financial situation, it was attempting to impose the least amount of LFOs it could. Graham is constitutionally indigent for purposes of this appeal and was so in the trial court. He is challenging the law for imposing mandatory LFOs on indigent defendants. Relying on the above-stated two part test, Graham has standing.

B.      RIPENESS

The State argues that Graham's claim is not ripe for review because the State has not yet attempted to enforce payment. We disagree.

In *State v. Blazina*, 182 Wn.2d 827, 832 n.1, 344 P.3d 680 (2015), the court clarified that a challenge to the trial court's entry of an LFO order under RCW 10.01.160(3) is ripe for judicial determination. The same rationale applies to LFOs imposed pursuant to other statutes.

C.    SUBSTANTIVE DUE PROCESS

Graham argues that RCW 43.43.7541 is unconstitutional because it violates the due process rights of defendants who do not have the ability or likely future ability to pay the obligation. We disagree. We recently rejected similar arguments in *State v. Mathers*, No. 47523-5-II, 2016 WL 2865576 (Wash. Ct. App. May 10, 2016).

We must determine whether RCW 43.43.7541[4] violates the guarantees of the due process clauses of the Washington and federal constitutions. RCW 43.43.7541 requires every sentence imposed for a violation of specified crimes include a $100 DNA fee. Felony violation of a no contact order is one of the specified crimes. RCW 43.43.7541.

Both the state and federal constitutions mandate that no person may be deprived of life, liberty, or property without due process of law. U.S. CONST. amends. V, XIV, § 1; WASH. CONST. art. I, § 3. "'The due process clause of the Fourteenth Amendment confers both procedural and substantive protections.'" *Nielsen v. Dep't of Licensing*, 177 Wn. App. 45, 52, 309 P.3d 1221 (2013) (quoting *Amunrud v. Bd. of Appeals*, 158 Wn.2d 208, 216, 143 P.3d 571 (2006)). "'Substantive due process seems to have been gradually adopted as the shorthand for individual rights which are not clearly textual.'" *Mathers*, 2016 WL 2865576, at *7 (quoting Stephen Kanter, *The Griswold Diagrams: Toward A Unified Theory of Constitutional Rights*, 28 Cardozo L. Rev. 623, 669 n.170 (2006)). "Substantive due process protects against arbitrary and capricious government action even when the decision to take action is pursuant to constitutionally adequate procedures." *Amunrud*, 158 Wn.2d at 218-19. "It requires that 'deprivations of life, liberty, or property be substantively reasonable' . . . [or] 'supported by some legitimate justification.'"

---

[4] This statute is entitled: DNA identification system—Collection of biological samples—Fee.

*Nielsen*, 177 Wn. App. at 53 (quoting Russell W. Galloway, Jr., *Basic Substantive Due Process Analysis*, 26 U.S.F. L. Rev. 625, 625-26 (1992)).

The level of review applied in a substantive due process challenge depends on the nature of the interest involved. *Amunrud*, 158 Wn.2d at 219. If no fundamental right is involved, the proper standard of review is rational basis. *In re Det. of Morgan*, 180 Wn.2d 312, 324, 330 P.3d 774 (2014).

For a statute to survive a rational basis review, it must be "rationally related to a legitimate state interest." *Amunrud*, 158 Wn.2d at 222. When applying this test, we may "assume the existence of any necessary state of facts which [we] can reasonably conceive in determining whether a rational relationship exists between the challenged law and a legitimate state interest." *Amunrud*, 158 Wn.2d at 222. The rational basis test "'is not a toothless one,'" but statutes are presumed constitutional, and the burden is on the challenger to prove the law is unconstitutional. *Mathews v. De Castro*, 429 U.S. 181, 185, 97 S. Ct. 431, 50 L. Ed. 2d 389 (1976) (quoting *Mathews v. Lucas*, 427 U.S. 495, 510, 96 S. Ct. 2755, 49 L. Ed. 2d 651 (1976)). Both parties correctly argue we should employ this standard of review.

Graham argues that an indigent's inability to pay the DNA fee is not rationally related to any legitimate state interest. However, Graham concedes that the DNA fee serves a legitimate interest because it "ostensibly serves the State's interest to fund the collection, analysis, and retention of a convicted offender's DNA profile so this might help facilitate future criminal identifications." Br. of Appellant at 13.

For the foregoing reasons, and for those stated in *Mathers*, 2016 WL 2865576, RCW 43.43.7541 does not violate due process because there is a legitimate state interest, as Graham concedes, and that interest is rationally related to the law and the infringement on the offenders' rights.

But Graham argues that the imposition of a mandatory fee on indigent defendants who will be unable to pay the fee does not rationally serve that interest. He is conflating arguments. The rational relationship still exists. However, to the extent that Graham argues that he could be incarcerated for failure to pay, there are protections in place and his claim fails. "[O]ur courts have held that these mandatory obligations are constitutional so long as 'there are sufficient safeguards in the current sentencing scheme to prevent *imprisonment* of indigent defendants.'" *State v. Lundy*, 176 Wn. App. 96, 102-03, 308 P.3d 755 (2013) (quoting *State v. Curry*, 118 Wn.2d 911, 918, 829 P.2d 166 (1992)).

> "Due process precludes the jailing of an offender for failure to pay a fine if the offender's failure to pay was due to his or her indigence. However, if an offender is capable of paying but willfully refuses to pay, or if an offender does not make sufficient bona fide efforts to seek employment or borrow money in order to pay, the State may imprison the offender for failing to pay his or her LFO. The burden is on the offender to show that his nonpayment is not willful. Although the offender carries the burden, due process still imposes a duty on the court to inquire into the offender's ability to pay. Inquiry into the offender's ability to pay comes at the point of collection and when sanctions are sought for nonpayment."

*State v. Stone*, 165 Wn. App. 796, 817, 268 P.3d 226 (2012) (internal quotations omitted) (quoting *State v. Nason*, 168 Wn.2d 936, 945, 233 P.3d 848 (2010)).

D.       EQUAL PROTECTION

Graham argues that RCW 43.43.7541 violates his equal protection rights because "it irrationally requires some defendants to pay a DNA-collection fee multiple times, while others need pay only once." Br. of Appellant at 16. We disagree. The two groups Graham asks us to

11

compare are offenders who are required to provide DNA samples one time and offenders who are ordered to give biological samples multiple times.

Under the Washington and federal constitutions, persons similarly situated with respect to the legitimate purposes of the law are guaranteed equal treatment. U.S. CONST. amend. 14; WASH. CONST. art. I, § 12; *State v. Manussier*, 129 Wn.2d 652, 672, 921 P.2d 473 (1996). "Equal protection is denied if a valid law is administered in a way that unjustly discriminates between similarly situated persons. Before [we] will scrutinize an equal protection claim, the defendant must establish that he is situated similarly to others in a class." *Harris v. Charles*, 151 Wn. App. 929, 936, 214 P.3d 962 (2009) (citing *State v. Handley*, 115 Wn.2d 275, 289-90, 796 P.2d 1266 (1990)).

Equal protection challenges are analyzed under one of three standards of review: strict scrutiny, intermediate scrutiny, or rational basis. *Manussier*, 129 Wn.2d at 672-73. When the classification does not involve a suspect class or threaten a fundamental right we utilize a rational basis test. *Manussier*, 129 Wn.2d at 673. We review Graham's challenge under the rational basis test.[5]

> When evaluating an equal protection claim, we must first determine whether the individual claiming the violation is similarly situated with other persons. A defendant must establish that he received disparate treatment because of membership in a class of similarly situated individuals and that the disparate treatment was the result of intentional or purposeful discrimination. Although equal protection does not require that the State treat all persons identically, any classification must be relevant to the purpose for the disparate treatment.

*State v. Osman*, 157 Wn.2d 474, 484, 139 P.3d 334 (2006) (citations omitted). "Disparate treatment of those within and without a designated class rationally relates to achievement of the State's objective if there is *some basis in reality* for the distinction between the two classes and

---

[5] Both Graham and the State correctly agree this standard is the one we should utilize.

the distinction serves the purpose intended by the legislature." *Osman*, 157 Wn.2d at 486. Like treatment must be afforded to people who are similarly situated with respect to the legitimate purpose of the challenged statute. *Manussier*, 129 Wn.2d at 672.

One purpose of this statute is to fund the state DNA database and defray costs for agencies that collect the biological samples. Another purpose of the statute is to satisfy the "public's incontestable interest in deterring recidivism and identifying persons who commit crimes and the likelihood that a DNA databank will advance this interest." *State v. Brewster*, 152 Wn. App. 856, 860, 218 P.3d 249 (2009). The statute's purpose is rationally related to the legislature's interest in funding the state's DNA database.

Regardless, Graham's equal protection claim fails because, "[w]ithout proof of discriminatory intent, a generally applicable law with disparate impact is not unconstitutional. 'The Fourteenth Amendment does not regard neutral laws as invidious ones, *even when their burdens purportedly fall disproportionately on a protected class*. A *fortiori* it does not do so when . . . the classes complaining of disparate impact are not even protected.'" *State v. Johnson*, No. 32834-1-III, 2016 WL 3124893, at *2 (Wash. Ct. App. June 2, 2016) (quoting *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 207, 128 S. Ct. 1610, 170 L. Ed. 2d 574 (2008)). Graham does not assert or demonstrate that the legislature had a discriminatory intent when it enacted RCW 43.43.7541.

Therefore, we conclude that RCW 43.43.7541 does not violate Graham's right to equal protection.

E.     COLLECTION OF DNA SAMPLE

Graham asks us to reverse the trial court's DNA collection order because it abused its discretion in imposing it. We disagree.

A party may object to a sentencing condition for the first time on appeal. *State v. Armstrong*, 91 Wn. App. 635, 638, 959 P.2d 1128 (1998). We review sentencing conditions for abuse of discretion. *State v. Riley*, 121 Wn.2d 22, 37, 846 P.2d 1365 (1993). A trial court abuses its discretion if the imposition of the condition was "on untenable grounds, or for untenable reasons." *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971).

The trial court ordered the biological sample under RCW 43.43.754(1). However, this statute provides that "[i]f the Washington state patrol crime laboratory already has a DNA sample from an individual for a qualifying offense, a subsequent submission is not required to be submitted." RCW 43.43.754(2).

It was clear that the trial court understood that Graham had likely provided a DNA sample in the past. However, Graham never presented proof of this fact and never affirmatively stated he had. And even if he had, the statute does not preclude the submission of additional samples from a defendant. RCW 43.43.754(2). The trial court did not abuse its discretion by ordering Graham to submit a DNA sample.

F.     DISCRETIONARY LFO

Graham argues that the trial court erred by ordering him to pay the discretionary $500 DAC recoupment fee because it mistakenly believed the fee was a mandatory LFO. Because it is not a mandatory LFO, we remand to trial court to make an individual inquiry on Graham's current and future ability to pay the discretionary DAC recoupment fee. *Blazina*, 182 Wn.2d at 830.

We affirm, but remand the case to the trial court to conduct an individualized inquiry on Graham's ability to pay the discretionary LFO imposed.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Melnick, J.

We concur:

_____
Maxa, A.C.J.

_____
Sutton, J.